Murray HOFFMAN et al.,
Plaintiffs-Appellants-Appellees,

v.

ESTABROOK & CO., INC., et al.,
Defendants-Appellees,

James F. Laura and Albert Eng,
Defendants-Appellants.

No. 78–1034.

United States Court of Appeals,
First Circuit.

Argued May 2, 1978.

Decided Oct. 26, 1978.

John P. Birmingham, Jr., Boston, Mass., with whom Mintz, Levin, Cohn, Glovsky & Popeo, Boston, Mass., was on brief, for plaintiffs-appellants-appellees.

George C. Caner, Jr., Boston, Mass., with whom R. K. Gad, III, and Ropes & Gray, Boston, Mass., were on brief, for Estabrook & Co., Inc., defendants-appellees.

Steven M. Brody, Boston, Mass., with whom Fleming & Brody, Boston, Mass., was on brief, for defendants-appellees-appellants, James F. Laura and Albert Eng.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

These are appeals from findings and rulings in a nonjury securities fraud case. Plaintiffs, unassociated purchasers of convertible debentures on January 28, 1970,[1] of a new company called Foto-Mem, Inc., brought action against its two principal officers, its directors and the underwriters pursuant to sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(2), 77q(a), and section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. At the time the action was instituted, January 28, 1972, the company was in a Chapter XI bankruptcy proceeding.

The defendant officers, James F. Laura and Albert Eng, appeal the findings of liability under section 10(b) and Rule 10b–5. Plaintiffs-appellants appeal the finding of no liability as to the defendant underwriters, Estabrook & Co., Inc., under sections 12(2) and 10(b) of their respective Acts. The district court also made a finding of nonliability as to the directors of Foto-Mem, Inc., but this has not been appealed.

The trial and the consequent findings and rulings focused on alleged misrepresentations and omissions as to the production stage of the two main products of the company.

### Background and Time Frame

Foto-Mem, Inc., was formed by defendant Laura on May 5, 1967. Laura had conceived an idea for coping with the "information explosion" through the development of a high capacity, high speed photo-optical storing and retrieval system which would interface with contemporary computers. Initial funds of approximately $100,000 were obtained by private investors, mainly through the efforts of Laura. Defendant Eng, who had extensive experience in computer technology and related fields, joined the company in January of 1968. Laura, who described himself as a financial consultant, did have some experience with computers, but it was Eng who had the engineering expertise and knowledge.

On January 8, 1969, the company made a public offering and its stock was traded in a range of from $18½ to $54 a share until the fall of 1969 when Foto-Mem, Inc., concentrated its financial efforts towards the sale of the debentures which led to this law suit. The prospectus prepared for this offering described its products as being in the development stage.[2]

Two machines were built and displayed at computer shows in Las Vegas and Boston to demonstrate the new storing and retrieval systems. The FM 390 was intended to store and retrieve digital information (computer readable) and to operate in conjunction with, and as a supplemental memory bank for, a computer. The memory bank consisted of plastic photodata cards on which information was stored and subsequently read by the use of a laser beam. Conventional computer memory banks used mag-

---

1. Some of the plaintiffs had also purchased stock prior to this date.

2. "The Company believes that it has conceived of new systems for storing and retrieving digital, textual and pictorial information photo-optically and is in the process of designing and developing such systems. However, as the Company is still in the design and development stages, and has not produced or sold any of these systems, and has not had the benefit of industry time-tests of any of these systems, there is no assurance that any of these systems can be produced and made operable or, if produced and made operable, that any of them will prove commercially feasible. The Company is presently building a prototype of its digital memory systems, but there is no assurance that it will successfully complete the same.

The Company also has designs for an audio memory system and for an analog and graphic memory system. The Company has a further design for a total information storage and retrieval system which, in effect, would incorporate all of its other memory system, digital, textual, pictorial, audio, graphic and analog. These designs for an audio memory system, for an analog and graphic memory system and for a total information storage and retrieval system are in the drawing-board stage. No prototype of them is being built, and there is no assurance that any such prototype can be built."

netic tape or magnetic cards. The advantage of the laser imprinted photodata cards was that each card could contain a great deal more information at far less cost than magnetic tapes or cards.[3]

The Risar, which was an extension of the FM 390, was designed to combine a computer capacity for index and calling up (positioning for transmission of information) the photodata card with television transmission of the information sought so that the cards did not have to be physically removed from the file and so that two or more interrogators could obtain information from the same card simultaneously.

The machines used as demonstrators at the two shows were hand assembled and contained within finished cabinets. The laser beam for the FM 390 was hand adjusted as required and the part of the Risar system used to store and call up the photodata cards was manufactured by another company, Mosler. The Mosler selectriever was capable of storing up to two hundred thousand microfilm cards and calling up any one of them automatically.

In September of 1969, Foto-Mem, Inc., began discussions with Estabrook, which culminated in an underwriting contract. Estabrook was to undertake the private placement of Foto-Mem debentures in return for options to purchase a part of them at a favorable price and was to be reimbursed for expenses, including sales commissions. Estabrook, of course, had the right to review the confidential memorandum which was to be distributed to potential debenture purchasers.

The district court found that the confidential memorandum contained material misrepresentations and omitted material facts. It was drafted mainly by the company lawyers, Stephen Honig and Jerome Gotkin, and Laura and Eng. A lot of time and energy was devoted to this memorandum;

seven drafts were drawn up before the offering circular was finalized. Estabrook's representative in direct charge of the offering, John M. Plukas, spent one day a week at the plant. He saw several of the drafts, but there is no evidence that he took part in any of the actual writing and formulation of the memorandum. The final draft was dated October 31, 1969, and circulated to prospective debenture purchasers immediately thereafter. Sale of debentures closed on January 30, 1970. The two other purchasers of debentures, American Suez Company and the Mellon Bank of Pittsburgh, did not receive the memorandum and are not parties to this suit.

With the exception of Eduard F. Catalono, all of the plaintiff who testified stated that they read the confidential memorandum and relied on it.[4]

Shortly after the closing of the debenture sales, Foto-Mem received an order from the New York Times to purchase a Risar which the paper intended to use to replace its "morgue."[5] The company from then on concentrated its efforts and time on meeting this order to the exclusion of further work on the FM 390. Mosler, the owner and producer of the card selection system, which had been used by Foto-Mem in its demonstration model of the Risar, had also been bidding for the Times contract. When it learned that Foto-Mem had been awarded the contract, it refused to sell it a selectriever, Foto-Mem, therefore, had to design and fabricate its own card selection system for the Risar ordered by the Times. There was testimony by Eng that the Mosler selectriever was not adequate anyway because it used different card sizes and that he had determined to build his own system in 1969. A unit with a Foto-Mem built card selectriever was finally delivered to the Times in August of 1970, but it failed to work properly because of the inadequacies of the card selection system.[6] Despite in-

---

3. Each photodata card could store at least ten million "bits" of information. Eight "bits" made a "byte" which corresponded to a digit, a letter or other single character.

4. The memorandum is attached hereto as Appendix A.

5. A collection of reference works and files of reference material.

6. The photodata cards rested in a cell. The mechanism needed for the Risar to operate properly had to be able to store the cells, pick up and deliver the designated cell to the selec-

tensive work for several months by Foto-Mem's engineers and technicians, the Risar was never able to meet the Times' requirements.

It became apparent to Laura and Eng, as well as others, in the late spring of 1970 that Foto-Mem was running out of money. A meeting was, therefore, scheduled for July 15 to which all debenture holders were invited in the hope that they would be persuaded to invest additional funds. The hopes for a cash infusion were not realized. Laura left the meeting abruptly when the debenture holders began to ask hard questions about the financial condition of the company. The reason given for the arid cash condition was poor management which, of course, covers a multitude of sins. After failing to meet the second interest installment on the debentures, due January 30, 1971, Chapter XI bankruptcy proceedings were commenced.

## I. THE FINDING OF FRAUD

We begin our analysis of the evidence with a statement of the obvious, that the district court's findings of fact must be upheld unless clearly erroneous. The district court found that Laura and Eng had committed fraud in the preparation of the confidential memorandum:

> I find actual intent to deceive by Eng and Laura in informing, and not informing, the other defendants, as well as many plaintiffs individually, and I find they knowingly, and intentionally, and as a matter of proximate cause, were responsible for the found material misstatements and omissions in the Memo.[7]

Rule 10b–5 fleshes out section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). It provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> (1) to employ any device, scheme, or artifice to defraud,
>
> (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), defined the scienter necessary, at least absent extraordinary circumstances, for liability under 10b–5 as "a mental state embracing intent to deceive, manipulate or defraud."

It is clear that the district court's finding of fraud came within the ambit of the rule and the Supreme Court's definition. We turn to the evidence to determine whether the district court was clearly erroneous in finding that the statements in the confiden-

tor which would select and place the card in position for imprinting (writing) and reading. The chief difficulty with Foto-Mem's Risar was the inability to place single cards in position for imprinting and reading because the cards stuck together. Mosler had used an air current for positioning the cards; Foto-Mem's attempt to do this was not satisfactory.

7. There is a faint suggestion in the brief for Laura and Eng that the district court had ruled as a matter of law that "good faith" was not a defense. Such a ruling would have been manifestly incorrect. In defining "working prototype" the court stated: "I find that the word 'working' signified that it does work, not simply feasible in the sense that it can be made to do so. I do, however, accept, indeed, I expressly find, that a prototype with missing parts may still be described as working if the missing parts manifestly would work. But this means would work readily in fact, not merely in the subjective good faith expectation of the speaker. Good faith may be a defense for saying something untrue, but that is a different matter." We do not interpret this as a ruling of law negating a defense based on good faith. It correctly points out that a representation that a thing will work must be based on something more than the mere hope it will.

tial memorandum were intended to deceive putative investors as to the production stage of Foto-Mem's two products. The district court found that the whole thrust of the confidential memorandum was intended to impress investors with the fact that they could expect market production of the FM 390 and the Risar within a reasonably prompt time. It is sales, not research and development, that attracts investors. And the memorandum, the district court found, was deliberately pitched to impressing investors with the fact that production and sales were part of the immediate future.

### A. The Use of the Words "Working Prototype"

■ Much testimony was devoted to what the words working prototype used in the memorandum meant or would mean to the average investor. Despite defendants' position that the trial judge misdefined working prototype and reached into the wild blue yonder for its meaning, we find there was a sound evidentiary basis for the definition used by the trial court.

I find that the word "working" signifies that it does work, not simply feasible in the sense that it can be made to do so. I do, however, accept, indeed, I expressly find, that a prototype with missing parts may still be described as working if the missing parts manifestly would work. But this means would work readily in fact, not merely in the subjective good faith expectation of the speaker.

Leaving aside the self-interested testimony of the plaintiffs, all of whom explained what the word working prototype meant, the testimony of Richardson, Maurais, Mann, or Wemple, standing alone, was sufficient to securely anchor the court's definition; and the court, of course, was free to pick and choose from all the evidence for a definition that would fit the context of the case. We note that Laura, in answer to a question from the court, admitted that there was no working prototype of an automatic retrieval Risar. The one used in the shows was handloaded. But the district court had more than trial testimony on

which to based its finding that Laura and Eng deliberately misrepresented the production stage of the FM 390 and the Risar. As noted, *supra*, the confidential memorandum went through seven drafts before it was deemed satisfactory by the company lawyers. The first four drafts used the word "design" to describe the Risar: "The Company has a *design* for a Tisar which stores only written records such as business files called a Risar." (emphasis added). Attorney Gotkin testified that Laura and Eng insisted that the company had a working prototype of the Risar and that the word design be changed to working prototype. Moreover, in June of 1970, the company prepared a prospectus for the SEC preparatory to a stock offering that never materialized. In its second amendment to the registration statement, there was the following statement:

However, although the company has completed a "laboratory" prototype of its FM 390 and its first production model of a Risar there is no assurance that either system will withstand industry time tests.

Attorney Honig equated laboratory prototype with working prototype, but the district court could and did find that laboratory prototype meant a lesser advanced stage of development than a working prototype. The first draft of the SEC filing used the words engineering prototype. It was well within the district court's discretion to determine that working prototype meant the most advanced stage of development when compared with laboratory and engineering prototypes.

### B. The Laser Problem

■ The defendants take vehement exception to the district court's finding that the FM 390 had not reached the working prototype stage and was not ready for fabrication of the first production unit because of laser problems. They assert that any difficulty with the laser was of minor significance and that it could be corrected in due course. We note that Leonard Wemple, Director of Engineering for Foto-Mem, testified that the laser required frequent hand adjustment to keep it operating cor-

rectly, that the adjustment times were not satisfactory, that these continued to be problems after a new laser was purchased. There was also evidence, although the district court did not focus on it, from which it could be found that pains were taken at the shows to conceal the hand adjustment of the laser. The laser was an integral part of the operation of the FM 390. The use of the microfiche photodata cards depended on a laser that would work rapidly and accurately. It was not error for the district court to conclude that, at the time the confidential memorandum was disseminated, the laser problems contradicted the assertions that there was a working prototype of the FM 390 and that the company was in the process of fabricating the first production unit.

### C. *Other Misrepresentations*

The district court found that the statement that the FM 390 was capable of "a mass (multibillion bit) memory" was misleading because there was no readily available automatic photodata card selector system. Foto-Mem depended on the Mosler mechanism for its show demonstrators. The memorandum stated that the memory bank was the heart of the Risar. This was true. But the investors were not informed that what kept the heart beating was the Mosler selectriever. As the New York Times' experience proved, the Risar could not operate satisfactorily because the photodata card calling up system was defective. The investors should have been told explicitly the important role that the Mosler selectriever played in Foto-Mem's system. It might then have been obvious to some of them that dependence on a competitor for a vital part of the unit made this an extremely hazardous venture.

We think the district court was justified in finding that an explanation of how the money invested was to be used implied that, as far as the FM 390 and the Risar were concerned, research and development was about over and production and sales were just around the corner.[8]

### D. *Fraudulent Intent*

The next issue is whether there is evidence to sustain the district court's finding that Laura and Eng intended to deceive through the statements made in the confidential memorandum and the omissions therefrom. We find this a closer question than did the district court, but our review is restricted. We agree with the district court that "there was a bona fide purpose and a genuine hope of success." The issue is, was the district court clearly erroneous in finding that Laura's and Eng's hopes for success became so overriding as to result in deliberate deception. There is no doubt that both men, at very little personal expense, had acquired stockholdings that would make them millionaires if the company was successful. They both believed that all it would take to hit the jackpot was more time and money. They had the time and presumably the skill and knowhow; potential investors represented the money. We cannot say that the district court committed clear error in finding that Laura and Eng used the confidential memorandum to make material misrepresentations and deliberately omitted therefrom material facts in order to obtain working capital.

## II. THE FINDING OF NO. 10b–5 LIABILITY AS TO ESTABROOK

Plaintiffs-appellants claim that the district court erred in finding that Plukas, Estabrook's representative in charge of the Foto-Mem debenture offering, did not act

---

8. The confidential memorandum stated that the company "proposes to utilize these proceeds to promote and produce its present products . . . as follows:

| | |
|---|---|
| Tooling for production | $ 35,000 |
| Marketing and Advertising | 325,000 |
| Capital Equipment | 475,000 |
| | $835,000" |

It also stated: "In addition, the Company expects to expend a minimum of $500,000 in research and development costs in the near future, some of which would be allocated to continued development of existing products and some of which would be allocated to the design and development of proposed products."

recklessly in approving the confidential memorandum. We assume without deciding that recklessness, as well as fraud, will ground an action under Rule 10b–5.[9]

The main thrust of plaintiffs' argument is that the district court "failed to apply the proper standards for recklessness to the facts it found." The trial judge defined recklessness as "carelessness approaching indifference." That the definition is brief, terse and lacks case citations does not make it wrong. We turn first to tort law for a fuller definition. Prosser's definition is as follows:

> The usual meaning assigned to "wilful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, amounting almost to willingness that they shall follow; and it has been said that this is indispensable.

W. Prosser, Law of Torts 185 (4th ed. 1971). The Restatement words its definition differently, but it is to the same effect.

> § 500. *Reckless Disregard of Safety Defined*
>
> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

In the context of Rule 10b–5 cases, the Seventh Circuit viewed recklessness as follows:

> In view of the Supreme Court's analysis in *Hochfelder* of the statutory scheme of implied private remedies and express remedies, the definition of "reckless behavior" should not be a liberal one lest any discernible distinction between "scienter" and "negligence" be obliterated for these purposes. We believe "reckless" in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence. We perceive it to be not just a difference in degree, but also in kind.

*Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir. 1977).

We cited with approval the phrase "[reckless conduct] comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence" in *Cook v. Avien, Inc.,* 573 F.2d 685, 692 (1st Cir. 1978).[10]

By any semantic standard, the district court's definition of recklessness as "carelessness approaching indifference" is less rigorous and demanding than the one we approved in *Cook v. Avien, Inc., supra,* 573 F.2d at 692, which connotes some degree of intent rather than mere indifference. Although unusual, brevity can be the soul of a legal definition as well as wit; we find that the district court's definition of recklessness was not legally incorrect.

The question, therefore, becomes not whether the district court applied the proper standard, but whether its finding that Plukas was not reckless is sustainable by the evidence. The district court found that Plukas was negligent. There is a grey area

---

**9.** In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), the Supreme Court expressly refrained from deciding "the question whether in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5."

**10.** Plaintiffs' reliance on *SEC v. Universal Major Industries Corp.,* 546 F.2d 1044 (2d Cir. 1976), is badly skewed. In that case, the court held that a prosecution by the SEC for aiding and abetting in the selling of unregistered stock may be based on mere negligence. There was no definition of or discussion of recklessness. The court explicitly stated: "In these same decisions, we also made it clear that in SEC proceedings seeking equitable relief, a cause of action may be predicated upon negligence alone, and scienter is not required." *Id.* at 1047.

in which negligence merges into recklessness. We analyze the facts and findings to determine if such a merger occurred here.

 Plaintiffs, of course, do not quarrel with the district court's characterization of Plukas as "a man of intelligence and some experience," who "had great opportunity to observe." The court found "that his [Plukas'] belief in the accuracy of the Memo reveals considerable lack of care on his part." In his deposition, Plukas admitted knowledge of difficulties with the laser. He testified at trial that he knew that expansion from the FM 390 to the Risar involved engineering as well as mechanical problems and, most importantly, the court found that Plukas "understood that to progress from prototype to marketable unit required 'a great deal more work.'" The trial judge did not credit Plukas' testimony that he understood that the expansion equipment could be purchased readily from Mosler. All of this, as the district court found, adds up to a strong negligence case. But there is little, if any, evidence of indifference and none at all that would involve intent. As in the case relied on by plaintiffs, *Sanders v. Nuveen & Co., Inc., supra,* 544 F.2d at 793, there were no facts that would compel a finding that "acts of commission or omissions were reckless, that is, that they were so highly unreasonable and such an extreme departure from the standards of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been award of it."

Plukas, like Laura and Eng, insisted that there were working prototypes of the FM 390 and the Risar, but it was Laura and Eng on whom Plukas relied for this information. While Plukas did receive the drafts of the confidential memorandum for review, they were in completed form when he got them. He was not involved in the wording or composition of the memo. We cannot ignore the fact that Plukas invested money of his own in Foto-Mem; that belies any known or obvious danger. The district court's finding, clearly supportable on the record, that Plukas' failure to scrutinize the memo with scouring scepticism was due in part, at least, to the fact that two experienced investors, Suez American and the Mellon Bank, had conducted a technical investigation by experts and then became subscribers cannot be brushed aside. Plukas' view of Foto-Mem's future was, like that of most of the plaintiffs', dazzled and distorted by the rainbow hues that appeared to be leading directly to the pot of gold. We note also that none of the investors here were babes in the woods. Most of them had investing experience and some of them even had technical background and knowledge. Laura's and Eng's idea was alluring, but only Laura and Eng understood fully what was needed to turn their dream into reality. Under any accepted definition, it was not error for the district court to find that Plukas' conduct did not constitute recklessness.

### III. THE OMISSION FROM THE CONFIDENTIAL MEMORANDUM OF LAURA'S CONVICTION AND BANK ROBBERY

 The district court's finding that the omission from the memo of Laura's past criminal record was not material was a judgment call and, in our opinion, correct. Laura's character and integrity were not involved; it was his idea that attracted the investors. Calling attention to a youthful misstep, if it was that, would in no way have alerted potential investors to a possibility of material misrepresentations and omissions in the debenture circular. Eng's past connection with a company that had failed might have been some sort of a warning signal, but very faint in the light of his obvious skill, knowledge and experience. The plaintiffs have not questioned the omissions as to Eng's background on appeal and we advert to it only for purposes of comparison.

### IV. SECTION 12(2) AND THE STATUTE OF LIMITATIONS

There is no question that Estabrook would be liable under section 12(2) of the

Securities Act, 15 U.S.C. § 77*l*(2),[11] were it not for the district court's finding that plaintiffs were barred by the time limitations of section 13 of the Act, 15 U.S.C. § 77m, which provides in pertinent part:

§ 77m. *Limitation of actions*

No action shall be maintained to enforce any liability created under section 11 [15 USCS § 77k] or section 12(2) [15 USCS § 77*l*(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 12(1) [15 USCS § 77*l*(1)], unless brought within one year after the violation upon which it is based.

 We address first plaintiffs' assertion that the district court erred in placing the burden of proof on plaintiffs. This is easily refuted. In *Cook v. Avien, Inc., supra,* 573 F.2d at 695, we held: "The burden of showing compliance with the § 12(2) statutory period of limitations rests on the plaintiffs."

We also held in *Cook v. Avien, Inc., supra,* at 697:

Although the question of whether reasonable diligence has been exercised is factually based, we conclude that the actual determination is a sufficiently mixed question of law and fact to permit an appellate court to resolve the issue at least where the action below was tried to the court.

We, therefore, turn to the evidence to determine if the plaintiffs acted with due diligence in pursuing their 12(2) claim. We must consider the nature of the misrepresentations and omissions, the opportunities to uncover them and the subsequent conduct of the parties. *Cook v. Avien, Inc., supra,* at 696–97. The district court found that plaintiffs were or should have been put on "inquiry notice" by the meeting of July 15, 1970. Since there is no evidence from which it could be found that plaintiffs should have been put on notice earlier, our scrutiny starts with that meeting. The meeting was called because Foto-Mem faced a financial crisis; it was rapidly running out of money. The best account of what transpired at the meeting comes from the testimony of George Robinette and the memo he prepared after the meeting. Hard questions were asked by Robinette, Connors (Mellon Bank), and Glickman (American Suez) as to what had happened to the money already invested, and why the recent sales projections were not fulfilled. In response to these questions Laura stressed the technological capabilities of the company and minimized its financial problems. There is no evidence that any of the plaintiffs asked either Laura or Eng any questions about the production stage of the FM 390 or the Risar, even though some of them knew that the Times' Risar order was already late in delivery.[12] Robinette testified, "I did not question the company's technical ability or question its ability to create a product using the technology which it had. My concerns at that point were primarily about the management, the present finances and the future financial condition of the company and its ability to survive really." With the perspicacity giv-

11. "Any person who . . . (2) offers or sells a security (whether or not exempted by the provisions of section 3 [15 USCS § 77c], other than paragraph (2), of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

12. Robert Goldberg had been told by Laura that they expected to deliver a Risar system to the Times in March.

en by hindsight, it is obvious that the questions were directed to the wrong end of the operation.

Plaintiffs argue that the defendants, Laura, Eng, and Estabrook, actively concealed the fraud and, therefore, tolled the running of the limitations period. This was done, plaintiffs assert, by concealing the underlying facts as to the two products and purposely diverting plaintiffs' attention away from this by stressing financial matters. This rather ingenuous argument overlooks the fact that serious financial matters actually triggered the meeting and that no one asked any direct questions about the development stage of the FM 390 or the Risar at the meeting. There was no need to divert plaintiffs' attention to the financial straits of Foto-Mem; that was the avowed purpose of the meeting. Diversionary tactics were unnecessary. Plaintiffs had almost a blind faith in Foto-Mem's technological capabilities. This is best summarized by an excerpt from the final paragraph of Robinette's memo:

> The nut of the problem is that the Company is technologically very good, but its day-to-day administration stinks! And it is nearly broke, and its programs are still not bringing any money. But there is still enough here to be hopeful about (though that's all!) and, in any case, the quality of Eng and his products should continue to be very attractive to another company should the merger route be pursued.

It is true that, if Laura or Eng had stated at the meeting that the words working prototype in the confidential memorandum had been poorly chosen, some of the plaintiffs might have pricked up their ears. But failure to recant when not asked to is hardly evidence of active concealment. Laura's and Eng's fraud rested on what was said and left unsaid in the confidential memorandum. Their duty of disclosure was a continuing one. It was not limited to the July 15 meeting. It is also important to remember that the meeting was not instigated by the plaintiffs to obtain information; Laura and Eng called the meeting hoping to raise money from the debenture holders. The meeting was not set up as a smoke screen to divert the attention of the plaintiffs from the production stage of the FM 390 and the Risar. The question is whether, as a result of the meeting, plaintiffs should have begun to "smell a rat." We find it hard to understand why the plaintiffs continued to accept the company's product claims in the face of no sales and no money. "The financial data available to the purchasers provided them with sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale of the notes." *Cook v. Avien, Inc., supra,* at 697–698.

But, even if we accept plaintiffs' claim that the July 15 meeting was not the type of event that would trigger a "due diligence" inquiry, no reason is advanced as to why the failure of the Times Risar to work should not have aroused suspicions. Robinette testified, "I think it began to be apparent in the late fall, the early winter, the winter certainly of 1970,[13] that the test was not working out as well as people had hoped for in the beginning." Goldberg attended a meeting at the New York Times in the fall of 1970. He testified, "Well, it was obvious that the machine was there but it was not functioning." It was not until American Suez filed suit for fraud, based on financial misrepresentation and omissions, that plaintiffs began to take stock of their own situation. The Suez suit cannot be accepted as the starting point for a "due diligence" pursuit of the facts. Due diligence requires something more than passively waiting until suit is brought by another investor where financial storm warnings and operational problems with the main product had been clearly visible for more than a year. Under these circumstances, doing nothing for a year is not exercising due diligence.

*The judgment of the district court is affirmed.*

---

**13.** The complaint was filed January 28, 1972.

APPENDIX

FOTO–MEM, INC.

Private Placement
160,000 Shares of Common Stock

Enclosed are:

(1) *Confidential Memorandum* dated October 31, 1969, relating to offering of 160,000 shares of common stock at $25 per share, an aggregate of $4 million.

(2) *Addendum I* to such Memorandum, dated November 20, 1969, relating to Foto-Mem's acquisition in November, 1969, of substantially all the assets, subject to certain liabilities, of Wilkinson Computer Sciences, Inc., a manufacturer of small digital computers.

Confidential Memorandum No. 008

Delivered to: Robert Goldberg

FOTO–MEM, INC.
2 Mercer Road
Natick, Massachusetts

———

Private Placement

of 160,000 Shares

of Common Stock,

(Par Value $.01 Per Share)

Price: $25 Per Share

THESE ARE SPECULATIVE
SECURITIES

This Confidential Memorandum has been prepared for presentation to a limited number of institutional and individual investors, and the material contained herein is proprietary to Foto-Mem, Inc., and is to be used solely by potential investors in their evaluation of the securities hereby offered.

This Confidential Memorandum and the information contained herein may not be reproduced or used in any other manner without the express permission of Foto-Mem, Inc., and the offeree by accepting delivery of this Confidential Memorandum agrees to return this copy to Estabrook & Co. at the address listed below if the offeree does not undertake to purchase any shares.

Estabrook & Co. has been retained by the Company to act as its agent in connection with this placement.

Information contained herein has been prepared by the management of the Company from sources believed to be reliable, but is not guaranteed by the Company or by Estabrook & Co.

The sale of all shares offered hereby shall close on January 15, 1970, but may be postponed as provided in the Stock Purchase Agreement to be supplied to each purchaser.

If all of the shares offered hereby were placed, the Company would realize $4,000,-000, before deducting expenses estimated at $48,000. Unless the Company receives commitments for the placement of at least $2,000,000, none of the shares offered hereby will be placed.

The price at which the shares are to be sold was established by the Company in consultation with Estabrook & Co.

The Company reserves the right to withdraw all or any part of this offering at any time prior to the sale of the shares.

———

Estabrook & Co.
15 State Street
Boston, Massachusetts

———

Dated: October 31, 1969

———

No person has been authorized to give any information or to make any representations other than those contained in this Confidential Memorandum in connection with the offer contained in this Confidential Memorandum and, if given or made, such information or representations must not be relied upon as having been authorized by the Company or Estabrook & Co. This

Confidential Memorandum does not constitute an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorized.

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 521 |
| THE OFFERING | 521 |
| CAPITALIZATION | 522 |
| PRICE RANGE OF COMMON STOCK | 522 |
| USE OF PROCEEDS | 522 |
| HISTORY AND BUSINESS | 523 |
| PRODUCTS PRESENTLY BEING OFFERED FOR SALE | 523 |
| PROPOSED PRODUCTS | 525 |
| SALES | 525 |
| PATENTS AND TRADEMARKS | 525 |
| COMPETITION | 526 |
| MANAGEMENT | 527 |
| EMPLOYEES | 529 |
| PREMISES | 529 |
| PRINCIPAL STOCKHOLDERS AND PRIOR SALES OF COMMON STOCK | 530 |
| DESCRIPTION OF COMMON STOCK | 530 |
| OPTIONS TO PURCHASE SECURITIES | 531 |
| LITIGATION | 531 |
| LEGAL OPINIONS AND EXPERTS | 531 |
| REPORTS TO STOCKHOLDERS | 531 |
| FINANCIAL STATEMENTS | |
| PRODUCT LITERATURE | |

## INTRODUCTION

Foto-Mem, Inc. ("the Company") was incorporated under the laws of the Commonwealth of Massachusetts on May 5, 1967; it is located at 2 Mercer Road, Natick, Massachusetts. The Company is engaged in the design, development and manufacture of systems for the economic storage and rapid retrieval of various forms of information and particularly of digital, textual and pictorial forms of information. The Company is also engaged in the manufacture of certain electronic data processing (E.D.P.) communications devices; these are a cathode ray tube (CRT) terminal and a non-impact printer. To date, the Company has not sold any of its products.

## THE OFFERING

The Company is offering 160,000 shares of its common stock, par value $.01 per share, at a price of $25 per share, an aggregate of $4,000,000, with the assistance of Estabrook & Co., 15 State Street, Boston, Massachusetts. Estabrook & Co. makes a market in the Company's common stock and has done so since January, 1969, when shares of the Company's common stock were first sold publicly.

*Minimum Offering*: In the event all the shares offered hereby are not sold, the Company will close the sale of such lesser number as shall have been indicated for, provided a minimum of $2,000,000 is raised.

*Closing Date*: The sale of all shares offered hereby shall close on January 15, 1970, but may be postponed as provided in the Stock Purchase Agreement to be supplied to each purchaser.

*Expenses of Offering*: In connection with this offering, Estabrook & Co. will receive no compensation, but will be reimbursed for its out-of-pocket expenses estimated at approximately $17,000 (including salesmen's commissions not to exceed approximately $16,000). The other expenses of this offering, fees and expenses of counsel for the purchasers and the Company, are estimated at $31,000.

*Investment Representations*: This offering is made to a limited number of sophisticated investors who will purchase shares for investment only and not with a view to their resale, distribution or division among others.

The Stock Purchase Agreement to be executed by purchasers of the shares offered hereby will contain appropriate representations to that effect, and stock certificates representing shares purchased will bear an appropriate investment legend.

*Registration Rights*: The Stock Purchase Agreement will contain three registration rights, as follows, all commencing one year from the date of closing and terminating five years from such date:

1. Holders of at least 50% of the shares sold shall have the right to request one registration under the Securities Act of 1933 at the expense of the Company (except for underwriter's expenses and

commissions and blue sky expenses outside of New York and Massachusetts); such registration would, at the discretion of each holder of shares, cover any or all of such shares.

2. Any holder of shares shall have the right to include any or all of such shares in the first registration statement filed by the Company, at the expense of the Company (except for underwriter's expenses and commissions and blue sky expenses outside of New York and Massachusetts).

3. Any holder of shares shall have the right to include any or all of such shares in any registration statement filed by the Company subsequent to the registration statement referred to in paragraph 2 above, at the pro rata expense of such holder.

The rights contained in paragraphs 2 and 3 above are subject to reasonable conditions requested by any underwriter of such offerings.

## CAPITALIZATION

The capitalization of the Company as of October 31, 1969, as adjusted to give effect to the issuance of 160,000 shares of common stock being offered hereby, is set forth in the following table:

| Title of Class | Amount Authorized | Amount Outstanding October 31, 1969 | As Adjusted To Include All 160,000 Shares Offered Hereby |
|---|---|---|---|
| Common Stock, $.01 Par Value | 6,000,000 shs | 1,258,458 shs [1] | 1,418,458 shs [1] |
| Convertible Debentures [2] (five-year non-callable debentures due October 16, 1974, bearing interest at the rate of 8½% per annum) | $50,000 | $50,000 | $50,000 |

[1] Does not include 49,500 shares of common stock reserved for issuance under a Qualified Stock Option Plan (see "Options to Purchase Securities") or 125,000 shares of common stock issuable to Estabrook & Co. and certain of its employees upon conversion of debentures (see note (2) below).

[2] These debentures are convertible into an aggregate of 125,000 shares of common stock at a price of $25 per share, commencing October 17, 1970. Such conversion rights terminate on October 16, 1974. See "Principal Stockholders and Prior Sales of Common Stock."

See "Premises" for obligations of the Company under leases.

## PRICE RANGE OF COMMON STOCK

The Company's common stock has been traded in the over-the-counter market since its initial public offering at $8 per share in January, 1969. The price range of the common stock from such time to October 31, 1969, as reflected by inter-dealer bid quotations of Estabrook & Co. (which quotations do not include retail mark-ups, mark-downs or commissions, and do not represent actual transactions) are set forth below:

| | High | Low |
|---|---|---|
| January, 1969 | 25 | 23 |
| February, 1969 | 25½ | 18½ |
| March, 1969 | 27 | 18½ |
| April, 1969 | 39 | 25 |
| May, 1969 | 53 | 36 |
| June, 1969 | 51 | 42 |
| July, 1969 | 54 | 35 |
| August, 1969 | 48 | 35 |
| September, 1969 | 42 | 38 |
| October, 1969 | 51 | 38 |

## USE OF PROCEEDS

The gross proceeds to the Company will be $4,000,000, assuming the sale of all shares offered hereby. After paying the costs of this offering (estimated at $48,000), the Company proposes to utilize these proceeds to promote and produce its present products (FM390, TISAR/RISAR, Foto-Vision Inquiry Terminal, Foto-Print 30 Printer and Manual Microfiche Viewer) as follows:

| | |
|---|---:|
| Tooling for production | $ 35,000 |
| Marketing and Advertising | 325,000 |
| Capital Equipment | 475,000 |
| | $835,000 |

In addition, the Company expects to expend a minimum of $500,000 in research and development costs in the near future, some of which would be allocated to continued development of existing products and some of which would be allocated to the design and development of proposed products.

The balance of the proceeds will go to working capital, to be used principally for the purchase of inventory and overhead inherent in commencing production.

In the event the gross proceeds from this offering are less than $4,000,000, the Company's working capital will be reduced and the Company may be required to scale down its research and development costs and proceed more slowly with production of its various products.

To the extent the proceeds are not immediately required for use in the Company's business, they will be deposited in one or more commercial banks and/or invested in short-term interest-bearing securities.

## HISTORY AND BUSINESS

Since its organization on May 5, 1967, the Company has devoted its efforts principally to the development of photo-optical random access memory systems.

One of the major problems encountered by the scientific, business, governmental and educational communities has been the need for efficient storage and rapid retrieval of various kinds of information. High costs are encountered, great amounts of space are utilized and significant delays are suffered by organizations in these communities, whether or not they utilize computers, in the storage and retrieval of information.

Whether this information is in digital form, pictorial form or simply the pages in a file, the ability to store, retrieve and reproduce this information at low cost would appear to be a vital skill which has to be mastered in order to contain the so-called "information explosion."

The Company was organized to explore and develop what it believes is a new concept for the storage and retrieval of various kinds of information, and since then has designed and produced a working prototype of a digital mass memory employing such concept which it believes is superior to storage and retrieval equipment presently known to it to be on the market. The Company has also developed a systems design for the mass storage and rapid retrieval of record-type information utilizing the same concept.

## PRODUCTS PRESENTLY BEING OFFERED FOR SALE

Sales literature with respect to each of these products is appended hereto.

### FM390—Photo-Optical Random Access Digital Mass Memory

The FM390 is a mass (multibillion bit) memory which stores and retrieves digital information photo-optically on a commercially available film card the Company calls a Photo Data Card. The Company believes the FM390 has the following advantages over storage and retrieval systems that use magnetic tape, disc packs and drums:

(1) Reduction of costs by approximately 500 to 1 (when drive costs are taken into account).

(2) Reduction of space required to store a given amount of information by approximately 150 to 1.

(3) Comparable or faster access time (on the order of 50 milliseconds).

Applications of the FM390 include replacement or supplementing of digital information storage presently achieved by tape, disc pack or drum. One brokerage house's study indicates the total external digital memory market is growing at a 15% annual rate and will reach the $500 million per year level in 1973, and that the market for digital memory supplies will grow at a 15%–20% annual rate to $450 million by 1973.

The FM390 may be used either in conjunction with a computer or offline. The Company believes its FM390 is compatible with virtually all digital computers, and the Company contemplates supplying the necessary interfaces.

The FM390 is priced between $149,000 and $300,000 per storage-and-retrieval unit, depending upon capacity.

The Company has produced a working prototype and is in the process of fabricating the first production unit of its FM390. As with all of the Company's products, fabrication of some parts and components is performed by others; the Company assembles and wires its products.

## Total Information Storage and Retrieval System (TISAR and RISAR)

The Company has a systems design for a total information storage and retrieval system (TISAR) capable of handling pictorial, textual, audio, analog, graphic and digital information, all on Photo Data Cards. The Company also has a working prototype for a TISAR which stores only written records such as business files, called RISAR (Record Information Storage and Retrieval), and the Company believes its immediate market opportunities may be principally in the RISAR area. The annual market for record-type information storage and retrieval equipment has been estimated by one management consulting firm at $350 million, with an 11% growth rate to a level of $595 million by 1973; one brokerage house in 1968 noted that the industry expected a $2 billion annual sales level in four to seven years.

The operator can retrieve information recorded in the system and (as appropriate) either view it on a television screen, transmit it to an input/output (I/O) device or produce a print-out by use of the Company's (or another's) printer. A large number of terminals connected to the system would permit many persons to read, copy, utilize and compute with the same information at the same time, eliminating the out-of-files problem.

As the systems design is modular, the Company believes it could be expanded to handle almost unlimited quantities of information. (Each storage and retrieval unit is priced from $70,600 to $300,000, depending upon capacity and options.) Possible applications include: automating the files of government agencies, banks, insurance companies, and any commercial organization; storing entire libraries; recording course materials for universities; or any other situation requiring inexpensive, high-density storage and rapid retrieval of record-type information.

## Foto-Vision Inquiry Terminal

The Foto-Vision Inquiry Terminal is a desk-top cathode ray tube (CRT) monitor viewer with detachable keyboard. It is priced at between $2,640 and $2,990. This remote terminal may be used to achieve visual display of information stored either in a computer or in a random access mass memory (whether that information is computer-readable or human-readable). The Company believes that the terminal would be compatible with most digital computers with appropriate interfaces. The Company further believes that its terminal is priced below competitive terminals presently available.

Estimates by a particular brokerage house and by a certain management consulting firm set the market for terminals of this type in the $80–$500 million per year range by 1973–1974.

The terminal permits data to be entered into a memory via the keyboard, displayed for verification or editing, and viewed following retrieval. Its operation is virtually silent. The Company believes this terminal has application to time-sharing systems and can also be utilized as a remote terminal in the TISAR and RISAR systems. Further, the Company believes that it is compatible with present communication terminal devices such as the Teletype printer, paper tape reader/punch and data-phone.

The Foto-Vision has three main models, designed for displaying:

(a) alphanumeric information; or

(b) alphanumeric plus graphic information; or

(c) alphanumeric plus graphic plus pictorial information.

Several production prototypes have been assembled and are being tested.

*Foto-Print 30 Printer*

The Company has designed a non-impact page printer, using electrostatic printing techniques, which it proposes to market at between $927 and $1,232. A first engineering prototype is being assembled and tested; this prototype is designed to print at speeds of 10, 15 and 30 characters per second.

One estimate of the potential market for these printers, made by a management consulting firm, was for $180–$250 million in annual sales by 1974.

The printer as presently designed has only two moving parts and is practically noiseless.

*Manual Microfiche Viewer*

The Company has developed and is presently producing a manually operated microfiche viewer which illuminates and enlarges microfiche (microfilm cards).

The Company believes that its viewer, which is priced at approximately $200, has greater clarity and brightness than other presently available and comparably priced viewers.

## PROPOSED PRODUCTS

The Company has designs for the products listed below, but has not yet commenced prototype construction and presently has made no decision as to when it will do so.

(a) Automatic microfiche reproduction system—This system would retrieve and copy microfiche and return them to storage automatically at high speeds.

(b) High speed photo-composition machine—The Company's design is based on photo-optical techniques which the Company believes would reproduce textual information (fed into it by a keyboard or a tape or other such device) on a photosensitive medium, in justified (even) lines of text, without hyphenation, and in a variety of type styles and sizes.

(c) Equipment for improved transmission of data over telephone lines—This equipment would permit more rapid telephone transmission of data than would equipment presently on the market.

## SALES

As of October 31, 1969, the Company had had no sales. The Company presently is involved in an extensive sales campaign to orient insurance companies, government agencies, educational institutions and other prospective purchasers to the advantages of the Company's products. The Company presently is also negotiating several orders. Delivery time on any orders placed would vary, depending upon the size of the order and the nature of the products involved.

The Company has hired a Director of Marketing and seven salesmen, utilizes sales representatives throughout the country to market its products and recently has opened sales offices in California and Washington, D.C.

The Company contemplates the sale of its photo-optical mass memory systems both to direct users and to leasing companies. The Company also contemplates (1) serving as a supplier for the material and equipment which would be required by its products in day-to-day operation and (2) serving as a supplier for replacement parts.

The Company intends to develop its own service organization, which will coordinate with its sales efforts, and the Company also intends to make service contracts available to its customers. Until such Company service is available, the Company will contract for service of its customers through an independent service company.

## PATENTS AND TRADEMARKS

At the present time, the Company has on file an application for a patent on various aspects of its proposed storage and retrieval

systems. The Company presently is in the process of filing patent applications on certain aspects of other of its various products. If, in the opinion of the Company, patent protection is advisable as to any other aspects of its products, the Company will attempt to secure the desired patents. There is no assurance that a patent will issue on any Company application or that it will be sufficiently broad in scope, or that its validity will be upheld, to provide adequate protection to the Company.

The Company also has obtained a trademark on its symbol and has applied for trademarks on certain of its product designations.

## COMPETITION

### Introduction

The Company's various products are in the areas of information storage and retrieval and computer-peripheral equipment. In the Company's estimation, the aggregate potential in these markets, for all competing companies, is very substantial.

All these markets are and will continue to be highly competitive. However, since the markets involved appear to be large and relatively new, they seem to present many opportunities.

The competition in the Company's various products is:

### 1. *FM390*

The Company is aware of other companies (including Precision Instrument Company and International Business Machines Corporation (I.B.M.)) working on photo-optical and other automated systems for the storage and retrieval of digital information; in addition, other potential competitors, both large and small, may be doing research and development in this area. Further, the FM390 competes with all present storage methods (including magnetic tapes, disc packs and drums). However, the Company is not aware of any multibillion bit memory (such as the Company's) which is presently commercially available.

While the Company knows of one digital photo-memory system presently in operation in a Federal Government agency, the Company believes this system (which was built by I.B.M.) operates with normal photographic dark room techniques, including wet-chemical development. The Company's systems do not employ normal photographic image formation and processing, but what the Company believes to be a simpler, faster and completely dry optical process (which process is a feature covered by the Company's patent application).

### 2. *TISAR and RISAR*

The Company's systems would compete with present methods of mass storage of record-type information, including microfilm and microfiche systems, and regular and semi-automated file systems. The Company believes that these other systems are not designed to operate in conjunction with a computer and do not have high-speed-and-display capabilities. However, such systems may be under development by other companies (including by a Diebold, Incorporated-Sanders Associates, Inc. joint venture and by AMPEX Corporation), and some of these companies are larger and better established than the Company. Further, the Company has yet to assemble and test one of its systems in the field.

### 3. *Foto-Vision*

Although numerous display terminals are presently available (from, among others, Sanders Associates, Inc., I.B.M. and the Univac Division of Sperry Rand Corporation) and may be under development by others, the Company believes that no other terminal is available today which is as well suited for interfacing with mass storage and retrieval systems as its own and which can display information in both human-readable and machine-readable form.

### 4. *Foto-Print 30*

Numerous printers (including those manufactured by Teletype Corporation) are presently available commercially, and other companies may be in the process of develop-

ing potentially competitive devices. Further, there is no assurance that the Company will be able to produce a Foto-Print 30 which will prove competitive in the marketplace.

### 5. *Manual Microfiche Viewer*

Numerous other microfiche viewers for manual operation are presently available; some are offered by larger and better established companies than the Company.

### 6. *Other Products*

The other proposed products of the Company are in highly competitive fields and other companies known to the Company are in the process of designing potentially competitive equipment. While the Company believes its designs offer certain advantages, there is no assurance that the Company will be able to assemble working prototypes from its designs or that such prototypes will prove successful in the marketplace. Further, the principal energies of the Company will not be directed toward these products in the near future.

### MANAGEMENT

The executive officers and directors of the Company are:

| | |
|---|---|
| Dr. Albert Eng | President and Director |
| John A. Marcure | Treasurer |
| Harry W. Besse | Director |
| Dr. Bernard L. Boutin | Director |
| David A. Freedman | Director |
| Lawrence A. Levitt | Director |
| Daniel J. Webster | Director |
| Jerome Gotkin | Clerk |

The Company has agreed that it will use its best efforts to cause the election to the Board of Directors of John M. Plukas, an employee of Estabrook & Co. and, if requested, a designee of the purchasers.

*Dr. Albert Eng*, a professional mechanical engineer, was elected President of the Company on December 20, 1967 and a director on March 28, 1968. Dr. Eng holds a B.S. degree in Mechanical Engineering from the University of Massachusetts, attended graduate courses at Northeastern University and Massachusetts Institute of Technology, and received an honorary Doctorate of Laws degree from St. Michael's College, Vermont.

Dr. Eng is a member of the American Society of Mechanical Engineers, the National Micro-Film Association, the Society of Photo-Optical Engineers and Scientists and the Society of Photo-Optical Instrument Engineers.

During the three years prior to joining the Company, Dr. Eng was principally engaged as a consultant to the Company during the month of December, 1967, and as an engineering project manager for Itek Corporation (9/64 to 12/67).

*John A. Marcure*, a certified public accountant, joined the Company as comptroller in April, 1969, and was elected Treasurer of the Company on September 8, 1969. Prior to April, 1969, Mr. Marcure spent 6½ years with the certified public accounting firm of Main Lafrentz & Co. (which is also the Company's independent auditor). A member of the American Institute of Certified Public Accountants and the Massachusetts Society of Certified Public Accountants, Mr. Marcure received his accounting degree from Bentley College of Accounting and Finance.

*Harry W. Besse* became a director of the Company on July 18, 1968. He is Chairman of the Board of Hutchins, Mixter & Parkinson, Inc., members of the New York, American and Boston Stock Exchanges. Mr. Besse has been associated with Hutchins, Mixter & Parkinson, Inc. since its organization in 1967 and was a general partner of its predecessor partnership, Hutchins, Mixter & Parkinson, from 1949 to 1967. Mr. Besse is also a director of Allegheny Airlines, Inc., President and a director of Ventura International, Inc., and a director of Boston Garden Arena Corporation. From 1946 to 1962, Mr. Besse was President of the Boston Stock Exchange.

*Dr. Bernard L. Boutin* became a director of the Company on September 8, 1969. Since June, 1969, Dr. Boutin has served as President of Saint Michael's College, Vermont. He holds Ph.B. and honorary LL.D. degrees from Saint Michael's, and an honor-

ary Doctor of Humanities degree from Franklin Pierce College.

Dr. Boutin's career includes service as: Director, Corporate Information Services, Sanders Associates, Inc. (8/67 to 6/69) (he still serves as consultant to this company); appointments by President Johnson as Administrator of Small Business Administration (5/66 to 7/67) and as Deputy Director of the Office of Economic Opportunity (10/65 to 5/66); Executive Vice President of the National Association of Home Builders (11/64 to 10/65); and appointments by President Kennedy first as Deputy Administrator and then as Administrator of the General Services Administration (1/61 to 11/64). Dr. Boutin's other endeavors, aside from various real estate and insurance ventures, include serving two terms as Mayor of Laconia, New Hampshire, memberships or directorships on various Presidential committees, directorship of Indian Head National Bank (1967 to the present), and the chairmanship of the New Hampshire State Board of Education.

*David A. Freedman* became a director of the Company on June 11, 1968. He also served as Treasurer from October 9, 1968 until September 8, 1969. From 1959 to September, 1968, Mr. Freedman was a registered representative with Hayden, Stone Incorporated. Since September, 1968, he has been an independent financial consultant. Mr. Freedman is also a member of the Board of Directors of a number of other companies.

*Lawrence Levitt* became a director of the Company on March 28, 1968. He is, and for more than ten years has been, a practicing lawyer in the City of New York.

*Daniel J. Webster* became a director of the Company on March 28, 1968. From October, 1967 to date, Mr. Webster has been an independent consultant; he presently conducts his consulting business through the firm of Webster Associates, Inc. From 1960 to October, 1967, Mr. Webster was Executive Vice President of Potter Instrument Company, Inc.

*Jerome Gotkin* became Clerk of the Company on July 3, 1968. He is a partner in the law firm of Widett & Kruger, the Company's general counsel. Mr. Gotkin has been associated with Widett & Kruger since September, 1965, prior to which he was a practicing lawyer in the City of New York.

Other key employees of the Company include

*James F. Laura* : Associated with the Company from its formation as a founder, officer and director, Mr. Laura now serves as *General Manager*. Mr. Laura has studied at Boston University, Lowell Institute and Massachusetts Institute of Technology and has worked in a variety of scientific and business capacities, including as chief sales engineer for Freeport Tile and Marble Company, Inc. (11/66 to 2/68) and as sales engineer for Peter Bratti Associates, Inc. (7/66 to 11/66) and for Construction Specialties Company, Incorporated (4/61 to 7/66). Mr. Laura initiated the Company's entry into the area of photo-optical mass memories.

*Gordon Marcotte* will join the Company on December 1, 1969, as *Director of Manufacturing*. For the past 13 years, Mr. Marcotte has served in a variety of capacities with Honeywell, Inc., including as Installation Supervisor in the Field Service Department, as Manager of the Systems Test Department, as Manager of the Quality Assurance and Final Test Department, and most recently as Assistant Program Director for Advanced Computer Systems. Mr. Marcotte, who studied electrical engineering at Lawrence Institute of Technology, also has served as Manager of Data Processing for the United States Ordinance Tank Automotive Command and as General Foreman/Heavy Repair at Hudson Motor Car Company.

*Donald D. Arnold* joined the Company as *Director of Sales* on June 4, 1969, prior to which he was self-employed as a manufacturer's representative (7/67 to 5/69) and served as Sales Manager for Atlantic Panels, Inc. (9/63 to 7/67). Mr. Arnold attended Eastern Nazarene College, Northeastern University, Cahill School of Photography and studied microfilming at the United States Air Force Photo School at Lowry Air Force Base, Colorado.

*Robert L. Wemple* has served as the Company's *Director of Engineering* since December 1, 1968, prior to which he served as an electrical engineer and Engineering Project Manager with Sanders Associates, Inc. (1964 to November 1968), and in the data processing field at The National Cash Register Company, Radio Corporation of America and Honeywell, Inc. At Honeywell, Mr. Wemple served as Supervisor of the Mechanical and Circuit Section (Field Service), Section Head/Memory Group, Section Head/Peripheral Circuit Design, Staff Engineer and Manager of the Product Line Development Department. Mr. Wemple holds a B.S. in electrical engineering from Syracuse University and has taken graduate courses at University of Pennsylvania and Northeastern University.

*James E. Clark* has served as *Director of Marketing* since July 2, 1969, prior to which he was self-employed as a marketing consultant and served as Area Manager of Consolidated Electrodynamics Corporation (12/67 to 11/68), Special Assistant to the President of Instrument Associates Inc. (1966 to 12/67), and Marketing Manager of BASF Computron, Inc. (1964 to 1966).

Mr. Clark was graduated from Tufts College with a B.A. degree, and has taken management courses at Harvard University and the American Institute of Foreign Trade. He is a senior member of the Instrument Society of America and a member of both the Institute of Electric Electronic Engineers and the Data Processing Management Association.

*Norman Dalrymple* joined the Company as *Comptroller* in October, 1969. Prior positions include self-employment as a Certified Public Accountant (8/69 to 10/69 and 4/59 to 4/67); controller of Harrington & Richardson, Inc. (4/67 to 8/69); financial positions with Scovill Manufacturing Company and General Motors Corporation; and service as a staff accountant for Lybrand, Ross Bros. & Montgomery. Mr. Dalrymple is a graduate of both Yale University's Sheffield Scientific School (with a B.S. in Eco-

nomics) and the Harvard Business School (M.B.A. in Accounting and Finance).

For the fiscal year ended March 31, 1969, no officer or employee of the Company received aggregate compensation exceeding $30,000. Dr. Eng presently receives a salary at the rate of $25,000 per annum, and all the above-named officers and employees as of December 1, 1969, will receive salaries at the annual aggregate rate of $163,200 per annum.

Directors of the Company do not receive compensation for serving on the Company's Board.

## EMPLOYEES

As of October 31, 1969, the Company employed 41 persons, including its President, Dr. Albert Eng. In anticipation of commencing production, the Company will be hiring additional technical and production personnel, which personnel the Company believes will be available as the need for them arises.

The Company's employees have entered into contracts with the Company whereby they are obligated to assign to the Company all inventions within the scope of the Company's business made by them during their employment, and to refrain from competing with the Company during such employment period.

## PREMISES

The Company leases 5,777 square feet of space at 2 Mercer Road, Natick, Massachusetts, on a net lease basis with a fixed annual rental of approximately $12,000. The lease expires July 31, 1971.

The Company has also leased a 20,000 square foot building, under construction, next to its current facilities, for an annual rental of approximately $55,000 (plus taxes and other expenses). The term of this lease is for 10 years from date of completion (estimated to be before January 1, 1970).

The Company also is negotiating to lease for two years, commencing as of October 15, 1969, 4,000 square feet (with an option on an adjacent 12,000 square feet) at Billerica, Massachusetts, for production of its ter-

minal products, at an annual base rental of $3,000.

## PRINCIPAL STOCKHOLDERS AND PRIOR SALES OF COMMON STOCK

The following table sets forth, as of October 31, 1969, the name and address of the only person known to the Company to own of record and beneficially 10% or more of the outstanding shares of common stock of the Company, and also the number of shares of common stock of the Company known to the Company to be owned of record and beneficially by all officers and directors of the Company as a group:

| Name and address | Type of Ownership | Number of Shares Owned | Percent of Class |
|---|---|---|---|
| Dr. Albert Eng<br>51 Cutler Lane<br>Chestnut Hill, Mass. | Record and Beneficial | 383,400 [1] | 30.5% |
| All Officers and Directors as a Group | Record and Beneficial | 464,160 [1] [2] | 37% |

[1] Includes 30,000 shares in the name of Dr. Eng's wife and 12,000 shares in the name of Dr. Eng's wife as custodian for Dr. Eng's minor children.

[2] Excludes 20,000 shares in the name of St. Michael's College; Dr. Boutin, a director of the Company, is President of St. Michael's.

Of the 1,258,458 presently issued and outstanding shares of common stock (taking into account subsequent adjustments): 828,-750 were issued to founders and others at nominal consideration; 70,500 were issued at $1 per share from August, 1967 to January, 1968; 162,000 were issued upon the conversion of convertible debentures at $1 per share in March, 1968; 46,458 were issued at $2 per share in private placements in June and July, 1968; and 150,000 shares were sold to the public pursuant to registration with the Securities and Exchange Commission at $8 per share in January, 1969.

On July 31, 1969, the Company issued 250 shares of its common stock to an investment banking firm in consideration of services performed for the Company.

The Company has also issued an aggregate of 500 shares of its common stock pursuant to exercises of employee qualified stock options.

### Debentures Issued in October, 1969

On October 16, 1969, the Company issued $50,000 in face amount of convertible debentures to Estabrook & Co. and three of Estabrook's employees. These debentures bear interest at the rate of 8½% per annum, are not callable, contain antidilution provisions, mature five years from date and after the first year are convertible into an aggregate of 125,000 shares of common stock upon the payment of the difference between the face amount of the debentures converted and $25 per share. Debenture holders were granted certain registration rights with respect to the common stock obtained upon conversion, substantially in the form of the rights offered purchasers hereunder.

Estabrook also has been given a three-year right of first refusal on all public or private financings of the Company, and the Company has agreed to use its best efforts to cause an employee of Estabrook & Co. to be elected to the Board of Directors.

## DESCRIPTION OF COMMON STOCK

Holders of the Company's common stock are entitled to receive such dividends as are from time to time declared by the Board of Directors; to one vote for each share on all matters voted upon by stockholders, including the election of directors; and in the event of liquidation, dissolution or winding up of the Company, to share ratably in all assets remaining after payment of liabili-

ties. The shares are not redeemable and carry no preemptive rights to subscribe for or purchase any additional shares of any class of stock. All shares offered hereunder will, when issued against receipt of the purchase price therefor, be fully paid and non-assessable by the Company.

The shares of common stock of the Company have non-cumulative voting rights.

The Company has never paid any cash dividends on its common stock. Payment of dividends hereafter, either in cash or stock, will lie within the discretion of the Company's Board of Directors and will depend, among other factors, on earnings, capital requirements and the operating and financial condition of the Company.

At the present time the Company's anticipated capital requirements are such that it intends to follow a policy of retaining earnings in order to finance its operations.

The transfer agent for the common stock of the Company is the New England Merchants National Bank of Boston.

## OPTIONS TO PURCHASE SECURITIES

On June 11, 1968, the Company adopted a stock option plan, approved by the stockholders, designed to qualify as a Qualified Stock Option Plan under the provisions of the Internal Revenue Code of 1954, as amended, authorizing the granting of options to purchase an aggregate of 50,000 shares of common stock to key employees of the Company at a price equal to at least 100% of the fair market value of the common stock at the date the option is granted. The plan provides that 25% of the number of shares covered by each option granted thereunder shall become exercisable one year after the date of grant and that an additional 25% thereof will become exercisable each year thereafter, on a cumulative basis. The entire option expires, in any event, five years after the date of grant. All options granted under the plan are conditional upon continued employment of the holder by the Company and contain certain antidilution provisions.

As of October 31, 1969, the Company had granted options for the purchase of 31,700 shares of common stock pursuant to the provisions of its Qualified Stock Option Plan. In July, 1969, an employee exercised an option for 250 shares, at $2 per share, and in October, 1969, another employee exercised an option for 250 shares, at $4 per share. The exercise prices of presently outstanding and unexercised options are $2 per share for 1,250 shares, $4 per share for 750 shares, $8 per share for 3,000 shares, $39 per share for 2,000 shares, $41.50 per share for 21,000 shares, $42.50 per share for 1,200 shares, $49 per share for 1,000 shares and $53 per share for 1,000 shares, which prices were determined by the Board of Directors.

## LITIGATION

There are no legal proceedings pending or threatened against the Company or to which it or any of its property are subject, and to its knowledge no such legal proceedings are contemplated.

## LEGAL OPINIONS AND EXPERTS

Legal matters related to the shares of common stock offered hereby are being passed upon for the Company by Messrs. Widett & Kruger, One Federal Street, Boston, Massachusetts, and for the purchasers of the shares by their special counsel, Messrs. Patterson, Belknap & Webb, One Wall Street, New York, New York.

The financial statements included herein as of March 31, 1969, have been included in reliance upon the report of Main Lafrentz & Co., independent certified public accountants, and upon the authority of said firm as experts. All other financial statements were prepared by the Company without audit.

## REPORTS TO STOCKHOLDERS

The Company will provide to its stockholders annual reports containing audited financial statements and such other reports as are provided for in the Stock Purchase Agreement to be supplied to each purchaser.