BEACON WOOL CORPORATION *vs.* HENRY F. JOHNSON
& another.

Suffolk.   December 9, 1953. — April 2, 1954.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & COUNIHAN, JJ.

*Corporation,* Officers and agents, Bonus, Foreign corporation.   *Contract,*
Of employment.   *Conflict of Laws.*

The law of the State in which a corporation is organized determines the
   liability of its directors for their acts as such.   [279]
By the law of Delaware, the directors of a corporation are liable to it for
   their acts as such which are done in bad faith.   [279–280]
So called bonuses paid by a corporation to its employees and constituting
   at most additional compensation for services already rendered which
   the corporation was under no contractual obligation to pay were mere
   gratuities.   [280–281]
Payments by a Delaware corporation to employees of three substantial
   bonuses in the nature of gratuities were illegal under Delaware law
   where it was found that such payments, made within a few months
   after the death of one who was president, sole stockholder and one of
   three directors, even if authorized by vote of all the directors before
   his death, were then authorized "upon the implied condition that
   . . . [he] should continue to be actively engaged in the company's
   business," that the two surviving directors knew that his death would
   probably bring about loss of a profitable agency arrangement provid-
   ing the corporation with more than ninety per cent of its annual busi-
   ness, which did occur shortly after the payments were made, and that
   the two directors did not act in good faith in causing the payments to
   be made;   and the two directors were rightly ordered in a proceeding
   brought by the corporation against them to pay it the amount of such
   illegal bonuses.   [280–281]
Payments by a Delaware corporation of bonuses out of profits to two of
   its directors, if gratuities, were illegal as an improper distribution of
   profits, or, if compensation for services rendered outside their duties as
   directors, were illegal since there was no contract to pay for such serv-
   ices made in behalf of the corporation by competent representatives
   having no personal interest in the matter.   [281–282]

BILL IN EQUITY, filed in the Superior Court on November
3, 1950.

The defendants appealed from a final decree entered after
hearing by *Broadhurst,* J.

*Lee M. Friedman,* for the defendants.

*Joseph P. Rooney, (John H. Devine* with him,) for the plaintiff.

SPALDING, J.  The plaintiff, a corporation, brings this bill in equity to compel the defendants, two of its directors, to restore to it sums paid by them as bonuses to its employees and to themselves.

The evidence is reported and the judge made careful and complete findings of fact which include the following: The plaintiff was organized in 1923 under the laws of Delaware. Its name at that time was Robert M. Pitt Company, Inc., but subsequently its name was changed to Beacon Wool Corporation, and it will be referred to hereinafter as the company.  Beginning in 1938 and continuing down to February 7, 1947, the company had three directors, Robert M. Pitt, Junior, and the defendants, Johnson and McKellar. Pitt was president of the company and owned all of its stock; he "dictated . . . [its] policy . . . in all its activities."  The defendant Johnson was first employed by the company as an accountant and later was elected its secretary and treasurer.  The defendant McKellar was employed by the company as a salesman in 1935 and later became general sales manager.  The company's business was buying and selling wool and wool products as merchant and as broker, but principally as broker.  Its place of business has always been in Boston.

In 1940, due chiefly to the effect of war in Europe, the company's business entered on a period of increasing prosperity which reached its peak in 1946.  Pitt and the defendants were working directors.  Pitt fixed his own compensation and that of the defendants and of the four or five women, who as stenographers, filing clerks or bookkeepers, were all the other employees of the company.

At a special meeting of the directors in Boston on February 27, 1941, all directors being present, it was unanimously "Resolved and voted: To authorize the President . . . to pay additional salaries to the Officers and employees of the . . . [company], at such times as it may be deemed ad-

visable for him to do so." At the next meeting of the directors of which a record was made, held on January 21, 1942, the same three directors "Resolved and voted: To authorize the President . . . to pay additional salaries to the Officers and Employees of the . . . [company] at such times as it may be deemed advisable for him to do so, during the Year 1942." "The minutes of the company contain no record of any other votes touching the subject of compensation of officers and employees, and no formal votes on that matter were ever adopted, excepting the two above quoted."

In 1942, pursuant to the above mentioned vote of January 21, 1942, Pitt for the first time directed payment of salaries and "bonuses" so called, and late in that year one bonus payment was made to each officer and employee. The salaries paid to women employees of the company in 1942 and annually thereafter were "commensurate with salaries being paid in those years by other employers in Boston for similar work." The payments made at Pitt's direction to himself and the other officers and employees were always spoken of as bonuses. In 1943 and continuing through 1946 "bonuses were paid at irregular intervals and in varying amounts, the amounts paid being determined by Pitt with reference to the profits being made by the company, and . . . 'When the spirit moved him.'" While the bonuses were based in part upon Pitt's determination that they were additional compensation for services rendered, they bore no specific relation in amount to the salaries of the employees. In some years the defendants and the other employees received bonuses which were larger than their salaries. "The payment of bonuses was at least as much based on Pitt's plan to share the company's profits with its employees, as to pay them additional compensation for services." Each of the defendants "testified that on December 2, 1946, in his private office, Pitt asked Johnson for, and received, a statement of the financial operations and profits of the business to December 1, 1946; that such statement showed substantial net profits . . . ; that the

prospects for 1947 were discussed and that it was agreed they were very good, and Pitt then announced, the defendants concurring, that bonuses would be paid in 1947 'upon the same basis as in 1946.'"[1] No record in any form "was made of such vote, if vote it was, and no announcement of the decision was made by Pitt or McKellar to the other employees, but Johnson told some of them."

The judge found that "the company was under no contractual obligation to pay its employees bonuses in 1947" and that the defendants "rely on no other action of the directors, and upon no other authority, for directing the payment of bonuses in 1947 than the vote they say was passed in a directors' meeting on December 2, 1946."

Pitt, although at work and apparently in good health two days before, died on February 7, 1947. He left a will in which he bequeathed all of his stock in the company to one Gertrude Rae Hazen, and this fact was known to the defendants within a few days after his death. Immediately following Pitt's death claimants of large amounts against the company appeared, and counsel for the defendants and the company and counsel for Hazen entered upon a series of conferences extending from February, 1947, through July, 1947. During these conferences the question of paying a bonus on July 1 was discussed, but nothing was said about the fact that bonuses had already been paid on February 14, March 31, and May 15. Counsel for Hazen opposed such action unless and until he was furnished a financial statement of the company's condition from 1946 down to date. Such a statement was promised repeatedly by Johnson but was never furnished until late in June.

On June 26, 1947, in letters to the company's counsel and counsel for Hazen, Johnson enclosed a statement of salaries and bonuses paid, saying that they were "for the first three months of 1947, which represents a quarter of the total

[1] The schedule of salaries and bonuses for the year 1946 was as follows:

|  | Anthony | Davis | Johnson | McKellar | Osgood | Pitt | Quigley |
|---|---|---|---|---|---|---|---|
| Salary | $1,860.00 | $3,021.30 | $ 5,214.26 | $ 9,600.00 | $3,014.80 | $20,000.00 | $2,008.75 |
| Bonuses | 3,031.53 | 3,364.55 | 8,765.65 | 15,390.43 | 3,394.20 | 5,950.00 | 3,018.66 |
| Total | $4,891.53 | $6,385.85 | $13,979.91 | $24,990.43 | $6,409.00 | $25,950.00 | $5,027.41 |

payments made for the year 1946." The letter also stated that at a meeting of the board of directors of the company Johnson had been "instructed to continue on for the year 1947 on the same basis at which payments were made for the year 1946." In fact the total bonuses paid to each employee at the time these letters were sent, with one exception, exceeded one third of the total bonuses[1] paid each such employee in 1946.

For several years before Pitt's death the company had obtained more than ninety per cent of its annual business from a firm, Mock and Odlin, of Buenos Aires and Montevideo, which did a large international business in wool, and represented the so called "Kahn interests." The Kahn business was given to the company because of the intimate acquaintance between Pitt and those controlling the Kahn interests. The defendants knew that in all probability the company would not be able to hold the Kahn business if Pitt's connection with the company was severed. Following Pitt's death the resident agent of Kahn wrote a letter to the company on March 11, 1947, in which he stated that the Kahn interests were placing their agency agreement with the company on a month to month basis. Previously the agency arrangement had gone on indefinitely as to time. "This letter meant to the defendants that the company's profitable connection with the Kahn interests was likely soon to terminate." Two of the 1947 bonus payments were made after the receipt of this letter. On June 30, 1947, the Kahn interests wrote the company that the agency relations with them were to terminate on July 31, 1947. In consequence, the company ceased doing business in August, 1947.

The remaining findings will be stated in the language of the trial judge. "On all the evidence I find inferentially

---

[1] The bonuses paid during 1947 were as follows:

|  | Anthony | Davis | Johnson | McKellar | Osgood | Quigley |
|---|---|---|---|---|---|---|
| February 14 | $ 395.97 | $ 429.98 | $1,134.14 | $2,023.80 | $ 459.12 | $386.92 |
| March 31 | 396.23 | 447.03 | 1,070.08 | 1,823.80 | 430.92 | 364.92 |
| May 15 | 410.21 | 495.18 | 1,200.88 | 2,023.80 | 489.32 | (not employed) |
| Total | $1,202.41 | $1,372.19 | $3,405.10 | $5,871.40 | $1,379.36 | $751.84 |

that, assuming Pitt declared on December 2, 1946, the defendants concurring, that bonuses would be paid in 1947 upon the same basis as in 1946, that declaration was upon the implied condition that Pitt should continue to be actively engaged in the company's business during the whole of the period for which bonuses were paid, and further that the defendants knew that his death would in all probability lead to the speedy loss to the company of its business with the Kahn interests, and that the loss of over ninety per cent of its business would seriously impair if not altogether destroy the company's ability to earn profits substantial enough to warrant the payment of any bonus. Although a substantial profit was earned in the first half of 1947, I find, on the foregoing facts and all the evidence, that in causing the company to pay bonuses to themselves and the other employees of the company on February 14, March 31, and May 15, 1947, the defendants as directors did not act with that good faith which their fiduciary obligation to the company required and that the payment of those bonuses was under all the circumstances illegal, and that the defendants should pay the company the amount so paid by it, with interest." A final decree was entered in accordance with these findings, and the defendants appealed.

1. We shall discuss first the payments of bonuses to the employees as distinct from those paid to the defendants, the company's directors, as the governing principles are somewhat different. Since the company was a Delaware corporation we must look to the law of that jurisdiction to determine the liability of the defendants for their acts as directors. Restatement: Conflict of Laws, § 197. See *Supreme Council of the Royal Arcanum* v. *Green*, 237 U. S. 531, 542–544; *National Lock Co.* v. *Hogland*, 101 Fed. (2d) 576 (C. C. A. 7); *Borg* v. *International Silver Co.* 11 Fed. (2d) 147, 151 (C. C. A. 2); *Massaro* v. *Fisk Rubber Corp.* 36 Fed. Sup. 382, 385 (D. C. D. of Mass.); *Union & New Haven Trust Co.* v. *Watrous*, 109 Conn. 268, 276–278; Beale, Conflict of Laws, § 185.2. The rule in Delaware is that "In the absence of fraud, either express or implied, the ac-

tion of the governing body of a corporation, in matters of internal management . . . will not be disturbed by a court of equity." *Hartford Accident & Indemnity Co.* v. *W. S. Dickey Clay Manuf. Co.* 26 Del. Ch. 16, 29. *Davis* v. *Louisville Gas & Electric Co.* 16 Del. Ch. 157, 169. *Mercantile Trading Co.* v. *Rosenbaum Grain Corp.* 17 Del. Ch. 325, 333–334. Compare *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 410–411; *Murphy* v. *Hanlon*, 322 Mass. 683, 686; *Uccello* v. *Gold'n Foods, Inc.* 325 Mass. 319, 321. We interpret this rule to impose liability on directors for acts done in bad faith. See *Italo-Petroleum Corp.* v. *Hannigan*, 40 Del. 534, 549.

We assume that after Pitt's death the defendants as the two surviving directors had authority to transact the affairs of the corporation. And we also assume that such authority would empower them to vote bonuses in appropriate circumstances to employees who were not directors. No contention is made to the contrary. But the trial judge has found in effect that in view of the precarious situation of the company after Pitt's death there was misuse of this authority, amounting to lack of good faith, in voting bonuses to the employees. It is to be noted that all three of the bonuses were paid after Pitt's death, and two of them were paid after the receipt of the letter of March 11, 1947, when there was good reason for the defendants to believe that the Kahn agency would soon be terminated. These bonuses, whether or not they were considered by the recipients as an essential part of their compensation, were in the nature of gratuities. The judge found that their payment "was at least as much based on Pitt's plan to share the company's profits with its employees, as to pay them additional compensation for services." At most they were increased compensation for services already rendered for prescribed salaries where there was no agreement express or implied that additional compensation be paid. That plainly follows from the finding that "the company was under no contractual obligation to pay its employees bonuses in 1947." We construe this finding as negativing the

existence of either an express or an implied contract. In view of these findings, which are not plainly wrong, there can be no basis for upholding the payment of these bonuses on a theory of an implied contract. Hence such cases as *Shaw* v. *Harding*, 306 Mass. 441, and *Church* v. *Harnit*, 35 Fed. (2d) 499 (C. C. A. 6), on which the defendants heavily rely, are not controlling.

But another finding, we think, is decisive. The judge, although making no finding that a bonus for the employees for 1947 was voted by the directors on December 2, 1946, found, inferentially, that even if there was such a vote it was "upon the implied condition that Pitt should continue to be actively engaged in the company's business during the whole of the period for which bonuses were paid." The defendants argue that this inference was not justified, but we are of opinion that it was.

While the conduct of the defendants in paying bonuses to the employees in 1947 may not have amounted to actual fraud, it nevertheless could have been found in the circumstances to have been constructively fraudulent in that it was illegal and in violation of the duty which, as directors, they owed to the company. See *Italo-Petroleum Corp.* v. *Hannigan*, 40 Del. 534, 549–550. It amounted to something more than a mere error of judgment.

2. The bonuses voted by the defendants to themselves are more easily found to be illegal. As the Supreme Court of Delaware has said, "Directors of a corporation are trustees for the stockholders, and their acts are governed by the rules applicable to such a relation, which exact of them the utmost good faith and fair dealing, especially where their individual interests are concerned." *Lofland* v. *Cahall*, 13 Del. Ch. 384, 389. Whether the bonuses were gratuities, or, as the defendants argue, were extra compensation for services rendered under a contract express or implied is of no consequence. If the former their payment would be improper, for the defendants would have no right to distribute the profits of the company in this manner. See cases collected in 40 A. L. R. 1423, 1432, et seq. If the

latter their payment would likewise be improper. The rule in Delaware is that directors have "no right to compensation for services rendered outside their duties as directors unless there . . . [is] an express contract to pay for such services, or, as some cases hold, unless the services were clearly outside their duties as directors and performed under circumstances sufficient to show that it was understood by the proper officers, as well as by the directors claiming compensation, that the services were to be paid for by the corporation. A contract to pay compensation for such services must be made with directors, or other proper corporate officers who have no personal interest, directly or indirectly, in the contract, and who are competent to represent the company in the transaction." *Lofland* v. *Cahall*, 13 Del. Ch. 384, 390. See *Italo-Petroleum Corp.* v. *Hannigan*, 40 Del. 534, 549–550. Compare *Winchell* v. *Plywood Corp.* 324 Mass. 171, 176–178. Applying this principle here, the payments of the 1947 bonuses by the defendants to themselves were illegal. Of course the payments of these bonuses might have been authorized or ratified by the sole stockholder, Hazen, but such authority or ratification was never obtained. See *Cahall* v. *Lofland*, 12 Del. Ch. 299, 314.

It follows that the decree rightly ordered the defendants to restore the sums paid as bonuses to themselves and to the other employees and is affirmed with costs of appeal.

*So ordered.*