Frederick **MASSARO** and Howard Slater, Plaintiffs,

v.

**VERNITRON CORPORATION,** Defendant.

Civ. A. No. 80–2263–G.

United States District Court, D. Massachusetts.

March 1, 1983.

Edward T. Dangel, III, Laurie A. Cooper, Atty., Dangel & Sherry, Boston, Mass., for plaintiffs.

Sydelle Pittas, Edwin McCabe, David Brody and Gene Landy, Widett, Slater & Goldman, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT ON COUNTS II, III AND V

GARRITY, District Judge.

Plaintiffs filed this action on October 14, 1980 alleging violations of state and federal securities laws and common law fraud on the part of the defendant corporation. The defendant moved on March 17, 1982 for summary judgment on all five counts of the complaint. Oral argument on the motion was heard on September 29, 1982. After considering the written submissions of the parties and the arguments presented at the hearing, the court grants summary judgment on Counts II, III and V and denies the defendant's motion for summary judgment on Counts I and IV for the reasons stated herein.

### Facts

Vernitron is a diversified electronics corporation with sixteen divisions that produce a wide variety of electromechanical, scientific and health care products, such as jet injection equipment and computer, telecommunication, automation and navigational systems components. It is a Delaware corporation with its principal place of business in Great Neck, New York and its stock is traded on the American Stock Exchange. Both plaintiffs are Massachusetts domiciliaries. Howard Slater is a Certified Public Accountant who resides in Swampscott, Massachusetts. Frederick Massaro, a tax accounting client of Slater's, is the owner of several businesses. His residence is in Winthrop, Massachusetts.

Slater's relationship with Vernitron began in August, 1967 when he made his first purchase of 50 shares of Vernitron stock for 29⅝ per share.[1] The price of Vernitron stock fell over the next two and a half years to 13¾. During that period Slater did not add to his Vernitron holdings. However, over the next seven years, Slater purchased close to 20,000 shares of Verni-

---

1. Although there are minor discrepancies between the plaintiffs' and defendant's submissions concerning the dates of the plaintiffs' purchases and sales of stock and the number of shares purchased or sold on various occasions, there are no major disagreements and most of these figures are not disputed.

tron stock, generally a few hundred shares at a time, and he made few sales of Vernitron shares. According to plaintiffs, as of February, 1977 he owned about 16,000 shares of Vernitron common. Slater continued buying Vernitron common from February, 1977 through June, 1978. During this period he bought over 17,000 additional shares. Massaro did not begin to invest in Vernitron stock until May, 1977 but at that time he made a couple of major purchases, buying 42,200 shares of Vernitron as his first purchase. Slater suspended his trading in Vernitron stock in mid-July of 1977. In September Slater began liquidating his Vernitron holdings, selling all of his Vernitron stock during the period from late September through early November, 1978.[2]

Massaro, on the other hand, suspended his trading in Vernitron in December, 1977 when he owned over 40,000 shares. In November, 1978 he sold 1000 shares and he sold 1000 additional shares in December, 1978.

The heart of plaintiffs' claim in this case relates to Vernitron's "Piezoelectric Division." Piezoelectricity is an electric property which allows a spark to be created when various chemicals and crystals are placed near each other. During the relevant time period, Vernitron was working to harness piezoelectricity for use as an ignition device. The devices Vernitron was working on developing would generate a spark to ignite a gas stove or a gas barbeque when the operator merely pushed a button.

During the period from 1970 to 1978, while Slater was buying Vernitron stock, Vernitron was working with piezoelectricity. Vernitron acquired a piezoelectric company in 1970 and assimilated that company into Vernitron as a separate Piezoelectric Division. Vernitron Limited, a European subsidiary of Vernitron, had been marketing piezoelectric igniters in Europe as a replacement for pilot lights on gas-fueled kitchen stoves since the mid-1960's and during 1971 Vernitron began to develop a pro-

gram for introducing similar devices into the United States market. Vernitron executives believed that a device which could produce a spark at the pushing of a button would be a tremendous energy-saving breakthrough. Pilot lights on gas stoves burn continuously and consume a very significant amount of gas each year. Therefore, Vernitron sought to convince manufacturers of gas ranges to modify their ranges, substituting Vernitron's piezoelectric device for their current pilot light technology.

There is dispute between the parties as to what efforts were made by Vernitron to move the piezoelectric devices onto the market. During this period Vernitron contacted the American Gas Association (AGA), an independent non-governmental organization which tests gas-related devices and certifies their conformity or non-conformity to standards which are promulgated by the AGA. Vernitron describes its efforts as having applied to the AGA for approval of a piezoelectric ignition system for gas stoves; the plaintiffs contend that Vernitron never applied to the AGA but rather sought to change AGA standards so that all push button ignition systems would be eligible for approval. The disagreement here is merely a question of semantics. Both parties agree that the AGA standards did not provide for approval of piezoelectric systems and required stove ignition systems to burn continuously. So, both parties agree that before the AGA would approve Vernitron's ignition system it was necessary for the AGA to change its standards or at least its interpretation of those standards. Therefore, whether the defendant was applying for approval or seeking to change AGA regulations so approval might be forthcoming, it is undisputed that the defendant was making efforts to get its product approved by the AGA. Vernitron never did obtain AGA approval for its piezoelectric device. Also gas appliance manufacturers refused to install Vernitron's igniters in their gas stoves.

---

**2.** Not all of Slater's transactions during this period were sales. Slater purchased almost 7000 shares of Vernitron stock in mid-1978, but

even these shares seem to have been sold by November.

In addition to trying to market piezoelectric devices to stove manufacturers for manufacture and sale in *new* stoves, Vernitron executives examined the possibilities of selling piezoelectric ignition devices to gas appliance dealers and servicemen to install the devices on gas ranges in the home, thereby bypassing the original equipment manufacturers. The homeowner would simply pay the installer to substitute a piezoelectric replacement or "retrofit" unit for the pilot light system.

In the summer of 1978, Murray Leonard, the project line manager for Vernitron's igniter products, conducted a study of the Philadelphia area. Philadelphia had been proposed as a test market for the piezoelectric device to be installed in stoves already on the market, to replace the pilot lights in those stoves. In September, 1978 Leonard reported that local gas companies would "red tag" appliances which contained igniters that were not approved by the AGA. "Red tagging" meant that the gas companies would place red tags on the appliance which read, "Unfit for Service—do not use."

Vernitron encountered other problems as well. For example, it became apparent that it was going to be extremely difficult to design a "universal kit" device that could be adapted to fit on all existing stoves that employed pilot lights. In addition, Vernitron's efforts to get the igniter included as an energy-saving device for which purchasers would receive a tax credit proved unsuccessful. Because of these and other problems, Vernitron's Piezoelectric Division ceased its efforts at marketing the ignition device for gas stoves and began adapting the device for use in outdoor gas barbeques.

Plaintiffs contend that defendant's efforts to market the igniter for use in gas stoves were inadequate and either the defendant could have obtained AGA approval of its product or the defendant should have gone ahead and marketed its product without AGA approval. The plaintiffs claim that they were told by officers of Vernitron that the lack of AGA approval would pose no obstacle to successful marketing of the device. The plaintiffs contend that the inadequacy of the defendants' efforts to make the piezoelectric device a commercial success constituted mismanagement and a breach of the defendant's fiduciary duty to its shareholders.

However, the plaintiffs' main contention is that during the period from the early 1970's through 1978 the defendant misrepresented the progress being made on the piezoelectric device and the status of defendant's piezoelectric project.

There are many different statements and omissions by Vernitron upon which the plaintiffs base their claim under Section 10(b) and Rule 10b–5. However, for the purposes of ruling on the instant motion, it is only necessary to focus on a few of the alleged misrepresentations.

### Defendant's Contentions

Defendant has moved for summary judgment on all counts, contending that (1) Vernitron's statements were true so the plaintiffs do not have a valid claim for misrepresentation; (2) sworn testimony of the plaintiffs given in other cases which are related to this case supports defendant's claim that no misrepresentation by the instant defendant can be proven; (3) there is no proof that defendant's representations, even if false, were committed with scienter so plaintiffs' Rule 10b–5 claim must fail; (4) there has been no showing that defendant's conduct was the proximate cause of plaintiffs' damages or even that the plaintiffs suffered any damages; (5) given the facts of this case, the purchases made by the plaintiffs which could have been made in reliance upon the defendant's misrepresentations were de minimus; (6) no cause of action for damages can be implied under § 17(a) of the Securities Act of 1933, so summary judgment should be granted on Count II of the complaint; (7) the plaintiffs' claim in Count III under the Massachusetts Uniform Securities Act, Mass.G.L. c. 110A, § 101, is without legal merit and is barred by the statute of limitations; (8) the plaintiffs' common law deceit claim in Count IV must fail because the plaintiffs

cannot show that the statements made by Vernitron officers concerning the defendant's intention to market the igniter were false when made; and (9) the Count V claims for mismanagement cannot be brought by individuals in the context of an action for securities law violations.

### The Standard for Granting Summary Judgment

As the party seeking summary judgment under Fed.R.Civ.P. 56, Vernitron bears the burden of affirmatively demonstrating that, with respect to every essential issue of each count in the complaint, there is no genuine issue of fact. *Mack v. Cape Elizabeth School Board,* 1 Cir.1977, 553 F.2d 720, 722. This is true even with regard to issues on which plaintiffs Massaro and Slater would have the burden of proof should the case go to trial. *Ramsay v. Cooper,* 1 Cir.1977, 553 F.2d 237, 240–41 n. 8; *Adickes v. S.H. Kress & Co.,* 1970, 398 U.S. 144, 159–161, 90 S.Ct. 1598, 1609–1610, 26 L.Ed.2d 142. All inferences from the facts contained in affidavits, exhibits and depositions must be viewed in the light most favorable to the plaintiffs, as the parties opposing the motion. *United States v. Diebold,* 1962, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176; *Ferguson v. Omnimedia,* 1 Cir.1972, 469 F.2d 194, 197. At the same time, however, the plaintiffs have an affirmative duty to come forward with specific facts showing that there is a genuine issue for trial and may not merely rest

upon the allegations set forth in their pleadings. Fed.R.Civ.P. 56(e); *United States v. Kenealy,* 1 Cir.1981, 646 F.2d 699, 706, *cert. denied,* 1981, 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250. There must be sufficient evidence supporting the claimed factual dispute to require a trial to resolve the parties' different versions; the evidence manifesting the dispute must be substantial. *Hahn v. Sargent,* 1 Cir.1975, 523 F.2d 461, 464, *cert. denied,* 1976, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754. Conclusory allegations, if not supported by facts, do not create an issue which should be reserved for trial. *Over the Road Drivers, Inc. v. Transport Insurance Co.,* 1 Cir.1980, 637 F.2d 816, 818–819; *Maiorana v. MacDonald,* 1 Cir. 1979, 596 F.2d 1072, 1078 n. 7. This is true even if the conclusory allegations are set forth in an affidavit. *Kenealy, supra* at 706.

### Count I—Section 10(b) of the 1934 Act

The first count of the complaint alleges that the defendant violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b),[3] and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. 240.-10b–5.[4] The substance of this allegation is the plaintiffs' contention that the defendant willfully, knowingly or recklessly misstated or omitted to state material facts about the piezoelectric division and the piezoelectric products and thereby caused the plaintiffs to suffer losses in connection with

---

**3.** Section 10(b) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**4.** Rule 10b–5 now provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit or state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

their sales and purchases of the defendant's stock.

The defendant has attacked this count on several grounds, contending that the discovery conducted in this case and in related cases makes it clear that the plaintiffs cannot establish all of the elements which they must prove to hold the defendant liable under Section 10(b) and Rule 10b–5 as they have been interpreted by the courts. There is substantial merit in *all* of the claims raised by the defendant. However, the plaintiffs have made a sufficient showing that a genuine factual dispute exists; hence defendant is not entitled to summary judgment on Count I.

The defendant denies that its public statements concerning the piezoelectric device were in any way false or misleading. However, even assuming the facts as the defendant states them, this court cannot now say that Vernitron's statements were not of a sort that would cause reasonable investors, relying on those statements, to purchase Vernitron's securities. *See SEC v. Texas Gulf Sulphur Co.,* 2 Cir.1968, 401 F.2d 833, 860, *cert. denied sub nom. Coates v. SEC,* 1969, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756, *cert. denied,* 1971, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558.

The facts conceded by the defendant, in its reply memorandum in support of its motion to dismiss, when read with the deposition of Bernard Levine, chairman of Vernitron's executive committee, outlined the following chronology:

1. Murray Leonard (Vernitron's engineering manager) was asked in late 1976 or early 1977 to develop a retrofit kit for the conversion of gas stoves to piezoelectric ignition.

2. By late March or April, 1977, Leonard had succeeded in modifying a [single] gas range to respond to piezoelectric ignition; [h]e continued to work on this project throughout the summer and fall of 1977.

3. As early as the fall of 1977 Levine thought a universal retrofit kit that would fit all models of stoves had to be developed, because it would not be eco-nomically feasible to market different kits for all the different brands and models.

4. During 1977 the plaintiffs were told that the piezoelectric retrofit device was close to marketing and that it would come out.

5. After a meeting with Congressman Edward Markey of Massachusetts in late November 1977, Levine told Massaro and Slater and others standing with them, while waiting for the elevator outside Congressman Markey's office, that Vernitron was soon going to market the product.

6. By the end of 1977 Vernitron had mounted piezoelectric devices on only three ranges (the brands being a Caloric range, a Tappan range and a Roper range) and the wiring and mounting configurations of each were different.

7. Leonard did not even develop a "mocked-up" kit or prototype retrofit device until April, 1978, and it would not fit all, nor even most, existing ranges.

Vernitron contends that "[b]y January 1978 Vernitron's Piezoelectric Division believed the kit would be ready in three months." However, the plaintiffs have produced a great deal of evidence that at no time in late 1977 or early 1978 could Vernitron have anticipated that "the kit" would be ready by April, 1978. Levine stated that piezoelectric devices had only been mounted on three ranges using very different wiring and mounting configurations by the end of 1977 and Levine believed that a universal kit that would fit all models of stoves had to be developed before the product could be marketed. Levine also stated that before the device would be ready to market there were thousands of man-hours of designing and field testing which would have to be done and all that Vernitron hoped was that by May they would be able to "define" the product that would be field tested.

Yet, in February, 1978 Benjamin Sachs (Vice President and Secretary of Vernitron) wrote to plaintiff Slater and enclosed with his cover letter a copy of a letter and a questionnaire that had been sent by Mark

Rickman, the General Manager of Vernitron's Piezoelectric Division, to the Associate Director of the New England Research Application Center. That enclosed letter, dated January 23, 1978, overstated the progress Vernitron had made on the piezoelectric device:

·We have successfully converted various gas ranges utilizing standard pilot lights over to piezo ignition. As we indicated on your questionnaire, a new series of conversion kits *is scheduled for market* in April of this year. (emphasis added)

Similarly, Vernitron responded to the questions in the questionnaire by responding that piezoelectric ignition systems for gas kitchen ranges were at that time "presently produced" and that they would be commercially available in April, 1978. Levine's deposition testimony shows that those representations were false. As the defendant's reply memorandum points out, the cover letter from Sachs did state that Sachs doubted that the April target date would be met, but the reason he gave was not that the product had not yet been developed. Sachs stated only:

In view of the recent severe weather difficulties in Ohio, I personally am doubtful that April target date can be met.

Levine's deposition testimony shows there was no way an April target date for marketing could be met, even with perfect weather in Ohio. These letters cast doubt on the defendant's claims that Vernitron accurately communicated the progress of the igniter kit project to the plaintiffs and that "[t]he plaintiffs were, therefore, well aware that Vernitron did not expect to have anything but a 'mocked-up' kit by May, 1978." True, plaintiffs had available to them other information that might have indicated to them that Vernitron could not have expected to "market" the piezoelectric device to consumers by April, 1978. However, it could be inferred that Benjamin Sachs' statement in the cover letter to the

effect that Slater should keep quiet about the information in the letter and questionnaire sent to the New England Research Center [5] might have led Slater to believe that he was being given particularly "inside" and confidential information about the status of the piezoelectric project which was likely to be the most reliable information available.

Realizing the weakness of their argument that all representations made by defendant Vernitron were true, defendant's counsel argue that under the reasoning of *Dolgow v. Anderson,* E.D.N.Y.1971, 53 F.R.D. 664, *aff'd per curiam,* 2 Cir.1972, 464 F.2d 437, the defendant can not be held liable for gross overstatements of the progress of the piezoelectric program if the statements were "made with a reasonable basis in fact." The defendant relies upon the court's statement in *Dolgow:*

The successful executive is likely to possess a "sure conviction" that his business problems can be solved; he brings to them "a bursting enthusiasm that is not found in the average man." O. Elliot, Men at the Top, 224 (1959). *See also, e.g.,* R. Kahn, D.M. Wolfe, R.P. Quinn, J.D. Snoek, R.A. Rosenthal, Organizational Stress: Studies in Role Conflict and Ambiguity, 321 (1964); R. Kappel, Vitality in a Business Enterprise (1960) reprinted in Harriss, Selected Readings in Economics (2d ed. 1963), 37, 38. An "ability to generate confidence" and to convince subordinates that the company is "going toward a goal which all would like to achieve" is seen as one of the chief assets of a successful executive. V. Packard, The Pyramid Climbers, 170–71 (1962).

*Dolgow, supra,* 53 F.R.D. at 686. However, *Dolgow* offers no support for the defendant's contention that the standard is whether the statement had a "reasonable basis in fact." To the contrary, the district court in *Dolgow* found that "[t]he information [the defendants] released was accurate and com-

---

**5.** The second paragraph of Sachs' cover letter read:

I am sending this to you because of your long-standing interest in our piezoelectric ig-

nition devices. As I am sure you understand, it is for your information only, and should not be circulated.

prehensive and defendants believed in its truth.... By acceptable standards, the individual defendants in this case were conservative in their expectations and predictions." *Id.* at 686–87. The plaintiffs have, at least to this point, raised a genuine issue of fact concerning whether Vernitron knowingly made representations that were false and overstated the progress of the piezoelectric ignition program.

The defendant has not demonstrated that this case is so distinguishable from *Hoffman v. Estabrook and Co., Inc.,* 1 Cir.1978, 587 F.2d 509, as to entitle the defendant to summary judgment. In *Hoffman,* the defendants circulated a confidential memorandum to prospective investors which included various misrepresentations and omissions as to the stage of development of two of Estabrook and Co., Inc.'s products. Vernitron's counsel argue that in *Hoffman* the two products were the defendant company's only two products while in this case the piezoelectric division is but one of Vernitron's sixteen divisions. However, that argument goes to the materiality of the representations, not their truth or completeness. And, in light of representations that the potential market for the piezoelectric retrofit ignition device included 40,000,000 stoves, we cannot say as a matter of law that the representations at issue were not material.

As an alternative to its claim that all of its representations were true, Vernitron contends that the plaintiffs' allegations in this case are controverted by their testimony in related cases and that Slater has already collected $192,000 from other parties in settlement of claims against those parties for causing the losses which are the subject of this action. Vernitron's argument is sound in two respects. *First,* to the extent that other parties made misrepresentations upon which the plaintiffs relied, that may support the defendant's claim that the plaintiffs did not really rely on the representations of the defendant or that the defendant did not cause the plaintiffs' damages. *Second,* the fact that the plaintiffs have already recovered damages from other individuals may serve to reduce the possible damage award in this case.

However, on the present record it does not appear that the plaintiffs' testimony in the other referenced cases is such that if believed it would preclude liability of the defendant in the instant case. A putative plaintiff may have relied on misrepresentations made by more than one party in connection with the same purchase or sale of a security. Cf. *Globus v. Law Research Service, Inc.,* 2 Cir.1969, 418 F.2d 1276, 1291, *cert. denied,* 1970, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93. *See generally* Fed.Sec.Code § 202(19) (1982), Restatement (Second) of Torts §§ 546, 548A. The past testimony of the plaintiffs which defendant's counsel quote at length in their memoranda of law does not state that private representations from Vernitron executives did not influence the plaintiffs' decisions about purchase and sale of Vernitron stock or that Vernitron's representations did not affect the market price of Vernitron stock. It is true that in the prior cases the plaintiffs did not mention that their losses were caused by Vernitron, but unless that specific question was asked they could hardly be expected to volunteer the information. The plaintiffs had the right to bring separate actions against the various parties who the plaintiffs claim contributed to or caused their injuries. When suing one tortfeasor or securities law violator the plaintiff is entitled to present all of the evidence the plaintiff has against that party.

So, to the extent that the defendant can show at trial that there are contradictions between the plaintiffs' depositions and testimony in other cases and the testimony in this case, that will be an issue for the jury. Such contradictions may highlight issues of fact that are in dispute rather than demonstrate that the issues are not genuine. *Thyssen Plastik Anger KG v. Induplas, Inc.,* 1 Cir.1978, 576 F.2d 400, 402.

Finally, Vernitron contends that it is entitled to summary judgment on Count I because (a) there is no evidence of scienter, (b) the plaintiffs' stock purchases in reliance on Vernitron's alleged misrepresenta-

tions were *de minimus,* and (c) the plaintiffs did not suffer any cognizable losses. These are all valid theories but they have not been established to a sufficient degree to support summary judgment.

■ As the defendant contends, in order to ground liability under Section 10(b) and Rule 10b–5 the plaintiffs will have to prove more than mere negligence on the part of the defendant. The plaintiffs must prove that Vernitron's statements were made with scienter, which has been defined as "a mental state embracing intent to deceive, manipulate or defraud." *Aaron v. SEC,* 1980, 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 1950 n. 5, 64 L.Ed.2d 611. However, the plaintiffs do not have to produce evidence that defendant intended to defraud or injure the plaintiffs:

> There is no indication that Congress intended that the corporations or persons responsible for the issuance of a misleading statement would not violate the section unless they engaged in related securities transactions or otherwise acted with wrongful motives; indeed, the obvious purposes of the Act to protect the investing public and to secure fair dealing in the securities markets would be seriously undermined by applying such a gloss onto the legislative language.

*SEC v. Texas Gulf Sulphur, supra,* 401 F.2d at 860. Proof that the Vernitron officers knew the statements were false when they made them is sufficient to establish scienter. *SEC v. MacDonald,* 1 Cir.1983, 699 F.2d 47 at 50 (en banc).

It can be inferred from the facts conceded by the defendant that Bernard Sachs knew the piezoelectric ignition device would not be ready for marketing in the spring of 1978 and, therefore, the letter and questionnaire sent to plaintiff Slater was false. That is not the only inference that could be drawn, however, so the defendant's scienter remains an issue to be resolved at trial.

■ Vernitron points out that there is evidence to support defendant's contention that many of the plaintiffs' transactions in Vernitron stock were not made in reliance upon Vernitron's representations. The defendant points to plaintiffs' prior testimony that many of their investments were induced by or were·in reliance upon other factors and parties not before this court. In addition, defendant is correct that damages suffered by the plaintiffs as a result of statements which induced the plaintiffs not to sell their stock are not recoverable under Section 10(b) or Rule 10b–5 because those are not damages incurred "in connection with" the purchase or sale of a security. *Blue Chip Stamps v. Manor Drug Stores,* 1975, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539. Finally, defendant draws our attention to the fact that the first purchases made by Slater after the November 1977 meeting with Congressman Markey were not until May 1978 and Massaro only purchased 100 shares of Vernitron stock after the November meeting.

However, the depositions of the plaintiffs allege that false representations concerning the progress of the piezoelectric ignition device were made throughout 1977, so it will remain a jury question as to whether those allegations are true, whether the statements were false when made, and whether those statements induced Slater and Massaro's other 1977 purchases of Vernitron stock. In addition, while the six-month delay between the meeting at Congressman Markey's office and Slater's next purchase of Vernitron stock casts significant doubt on Slater's claim that Vernitron's misrepresentations induced his purchase of 4400 shares in May and June 1978, that question cannot be decided at this stage of the proceedings, but must be preserved for trial.

Vernitron presses two other arguments as support for its claim that the plaintiffs have suffered no cognizable damages. *First,* Vernitron asserts that "the price trends in Vernitron stock correlated closely with trends in the Dow Jones average," so the changes in Vernitron's stock prices were caused by general market forces and not by the challenged statements or activities of Vernitron's corporate management. However, the cause of the price fluctuations in Vernitron stock is an issue which under the

facts of this case cannot be decided before trial. *Compare Bonime v. Doyle,* S.D.N.Y. 1976, 416 F.Supp. 1372, 1384–1386, *aff'd without opinion,* 2 Cir.1977, 556 F.2d 554, *cert. denied sub nom. Sloan v. Bonime,* 1978, 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774.

*Second,* Vernitron points to testimony of the plaintiffs in prior cases and alleges that the plaintiffs have testified that "any artificial inflation of [the] price [of Vernitron's stock] was caused by manipulative activities of Smith and Batemen Eichler," and therefore was not attributable to Vernitron's conduct or statements. However, the defendant has not cited for the court any testimony in which either plaintiff stated that the manipulative activities of Smith and Bateman Eichler were the sole cause of artificial inflation of the price of Vernitron's stock or were the sole cause of plaintiffs' alleged injuries.

Accordingly, Vernitron's motion for summary judgment on Count I is denied.

### Count II—Section 17(a) of the 1933 Act

■ Vernitron's motion for summary judgment on Count II challenges the legal sufficiency of the plaintiffs' claim that Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, provides them with an implied cause of action for damages. This issue has been considered by many other courts and no consensus exists.[6] The First Circuit has not yet had to decide the issue. *See Cleary v. Perfectune, Inc.,* 1 Cir.1983, 700 F.2d 774 at 779. In *Kaufman v. Magid,* D.Mass.1982, 539 F.Supp. 1088, 1097–98, Judge Tauro explained that most decisions in this circuit have held that no private cause of action for damages exists under § 17(a):

> Courts are split on whether Section 17(a) provides an implied private right of action for damages. Neither the Supreme Court nor the First Circuit has addressed

the issue. District courts in this Circuit, however, have adopted the view that Section 17(a) does not provide a private right of action for damages. *See, e.g., Dyer v. Eastern Trust and Banking Company,* 336 F.Supp. 890, 903, 910–11 (D.Me.1971); *Manchester Bank v. Connecticut Bank and Trust Company,* 497 F.Supp. 1304, 1313–14 (D.N.H.1980) (citing *Dyer*). *See also Rindner v. Stockcross, Inc.,* Fed.Sec. L.Rep. par. 97,885 at 90,479, 90,481 (D.Mass.1981) ("[I]t is unlikely that Congress intended such a private cause of action to exist") (citing *Dyer*).

> The court finds no reason to depart from the reasoning that these courts have espoused in declining to imply a private right of action under Section 17(a).

We subscribe to the view expressed by our colleague in *Kaufman* and explained in great detail by Chief Judge Latchum for the United States District Court for Delaware in *Hill v. Der, supra,* 521 F.Supp. at 1373–1378. Therefore, the defendant's motion for summary judgment on Count II is granted.[7]

### Count III—Mass.G.L. c. 110A

■ Count III is the plaintiffs' claim under Massachusetts General Laws chapter 110A, § 101. In footnote 2 of their memorandum in opposition to the motion for summary judgment and again during the hearing on this motion the plaintiffs represented to the court that they no longer press Count III. Accordingly, the defendant's motion for summary judgment on Count III is granted.

### Count IV—Common Law Fraud

Vernitron attacks the plaintiffs' common law fraud claim with arguments similar to those raised in opposition to Count I. In particular, Vernitron alleges that Count IV must fall because the plaintiffs cannot prove causation, or that Vernitron's alleged

---

**6.** The most comprehensive summary of the present state of the law with regard to whether an implied private right of action exists for a violation of section 17(a) of the 1933 Act can be found in *Hill v. Der,* D.Del.1981, 521 F.Supp. 1370, 1373–1378.

**7.** If a subsequent First Circuit or Supreme Court decision provides further guidance on this issue, the plaintiffs will of course be entitled to petition this court for reconsideration of this ruling. *See, e.g., Atlas v. Eastern Air Lines, Inc.,* 1 Cir.1962, 311 F.2d 156, 162.

misrepresentations were made with the requisite intent.

We have already addressed similar issues of causation and damages in ruling on Vernitron's motion for summary judgment on Count I. While Vernitron's arguments on these issues are substantial, they have not demonstrated an absence of genuine issues and have been reserved for trial.

Vernitron also argues that the representations at issue were not made with the intent necessary to ground liability in Massachusetts for common law fraud or deceit. This argument parallels Vernitron's claim that there is no evidence of the defendant's *scienter* under Section 10(b) of the 1934 Act and Rule 10b–5. As explained *ante,* the court believes there remain genuine issues which preclude summary judgment. Accordingly, the motion for summary judgment on Count IV of the complaint is denied.

### Count V—Mismanagement

The final count of the complaint alleges that Vernitron's failure to market the piezoelectric device when combined with its "failure to inform the plaintiffs in a timely fashion of the decision not to market the device" constitute violations of Rule 10b–5 and Massachusetts law. The substance of this count is an allegation that Vernitron's failure to market the piezoelectric device was mismanagement and, when that mismanagement is combined with the misrepresentations and omissions which are the basis for Count I of the complaint, this constitutes a separate claim for relief.

### A. *The Federal Law Claim*

 In general, claims of internal corporate mismanagement are not actionable under Section 10(b) of the Securities and Exchange Act of 1934 or Rule 10b–5. *Superintendent of Insurance v. Bankers Life and Cas. Co.,* 1971, 404 U.S. 6, 12, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128. In particular, as the plaintiffs concede, negligent corporate misconduct does not violate section 10(b) or Rule 10b–5. *Goldberg v. Meridor,* 2 Cir.1977, 567 F.2d 209, 220–221. However, plaintiffs cast Count V as an allegation of a breach of fiduciary duty rather than as an allegation of negligent mismanagement. Then, in an effort to state a cause of action under Rule 10b–5, the plaintiffs combine their claim of corporate mismanagement with the allegations of Counts I and IV, that the defendant failed to make accurate disclosures to the plaintiffs concerning the progress being made by Vernitron's piezoelectric division. In effect, the plaintiffs allege that the defendant's mismanagement, when coupled with the defendant's failure to disclose the mismanagement, constitutes a separate claim under Rule 10b–5. We disagree. Plaintiffs cannot "bootstrap" a breach of fiduciary claim under state law into a federal securities law violation in this manner. *Santa Fe Industries, Inc. v. Green,* 1977, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480. *See also Panter v. Marshall Field & Co.,* 7 Cir.1981, 646 F.2d 271, 288 (and cases cited therein). Count V does not set out a separate federal claim from the Rule 10b–5 claim in Count I. *See Calvani v. Vernitron,* 559 F.Supp. 1081, Civil Action No. 81–1916–S, Slip op. at 1085–1086 (D.Mass. March 9, 1982) (Skinner, J.). Therefore, if Count V is to survive the defendant's motion for summary judgment, it has to survive as a claim under state law, with this court having jurisdiction because of pendent or diversity jurisdiction.

### B. *The State Law Claim*

Examination of plaintiffs' state law claim of breach of fiduciary duty by defendant makes it clear that the plaintiffs have presented no evidence of anything except, possibly, negligent corporate mismanagement. The main allegation of mismanagement in the complaint concerns the fact that Vernitron did not manufacture or market the piezoelectric ignition device. Presumably the complaint is limited to the fact that Vernitron has never marketed a piezoelectric device for use in gas stoves, since it is uncontroverted that Vernitron has manufactured and marketed piezoelectric ignition devices for outdoor gas barbeques.

The defendant has come forward with a great amount of evidence concerning its piezoelectric division. The plaintiffs do not dispute that AGA standards in 1972 did not provide for approval of piezoelectric systems and required all ignition systems for newly-manufactured stoves to burn continuously. In addition, the plaintiffs do not dispute that during 1973 and 1974 Vernitron made an effort to obtain AGA approval and was never able to obtain that approval. It is uncontroverted that gas appliance manufacturers refused to install Vernitron's piezoelectric ignitions at least until they were approved by the AGA.

So, Vernitron concentrated its piezoelectric research on developing ignition devices to be installed on existing gas stoves. Three problems were eventually identified: (1) the Vernitron employees were unable to develop a "universal kit" as ignition device that could be installed on many, if not all, makes and models of stoves, (2) there was likely to be significant difficulty marketing the product because of "red tagging", the practice whereby the gas companies would designate stoves with piezoelectric ignitions as "unfit for service", and (3) Vernitron's efforts to lobby Congress to designate piezoelectric ignition devices as energy-saving devices for which energy tax credits would be available proved fruitless.

▇▇▇ Plaintiffs' mismanagement claim is based on the following allegations: (1) Vernitron did not begin to seek AGA approval until 1973, (2) only one or two low-ranking officials at Vernitron sought AGA approval on Vernitron's behalf, (3) Vernitron did not consider getting its ignition systems approved by state plumbing or electrical boards, (4) Vernitron's efforts to get AGA approval were "naive, poorly timed and far from intensive", (5) Leonard did not just work on the ignition device, but continued to work on "a multitude of other projects" as well, (6) when Glenn Howatt, manager of its Piezoelectric Division, died in 1977, rather than appoint one person as a replacement, Vernitron appointed a group of four managers and tensions developed as a result, (7) Vernitron had no "professional" marketing staff, (8) the Piezoelectric Ignition Systems were Vernitron's first consumer product, (9) Mr. Leonard, who was reassigned from his position as engineering manager and given responsibility for marketing the ignition devices, "had absolutely no marketing or product management background", (10) Mr. Rickman, one of the four appointed to fill Glenn Howatt's position, "had no professional engineering background", (11) Vernitron did not consider hiring a professional consultant, and (12) in 1978 nine managers of the piezoelectric division were fired. Even if these allegations were proved by the plaintiffs, they would not constitute a breach of fiduciary duty or actionable corporate mismanagement.

▇▇▇ Inasmuch as defendant is a Delaware corporation, claims of breach of fiduciary duty by corporate officers are evaluated by looking to Delaware corporate law. Massachusetts law requires that a court look to the law of the state of incorporation to determine the corporation's liability to its stockholders or creditors. *Beacon Wool Corp. v. Johnson,* 1954, 331 Mass. 274, 279, 119 N.E.2d 195. Delaware corporate law evaluates claims such as these by applying the business judgment rule:

> Directors of corporations discharge their fiduciary duties when in good faith they exercise business judgment in making decisions regarding the corporation. When they act in good faith, they enjoy a presumption of sound business judgment, reposed in them as directors, which courts will not disturb if any rational business purpose can be attributed to their decisions. In the absence of fraud, bad faith, gross overreaching or abuse of discretion, courts will not interfere with the exercise of business judgment by corporate directors.

*Panter v. Marshall Field & Co., supra,* 646 F.2d at 293 (discussing Delaware law). *See also Kaplan v. Goldsamt,* Del.Ch.1977, 380 A.2d 556, 566–569. The same standard applies to corporate officers. *Guth v. Loft, Inc.,* Del.Supr.1939, 23 Del.Ch. 255, 5 A.2d 503, 510; *Singer v. Magnavox Co.,* Del.Supr. 1977, 380 A.2d 969, 976–978.

The plaintiffs have failed to produce any evidence that the eventual decision not to market the piezoelectric ignition device for use in gas stoves was in bad faith or was fraudulent. The plaintiffs may be able to prove at trial that the defendant misrepresented the progress being made by the piezoelectric division or that the defendant failed to keep the plaintiffs apprised concerning the problems the piezoelectric division was encountering. Those allegations are the substance of Counts I and IV of the complaint. However, there is no evidence that the defendant acted with fraudulent intent when it made the decision not to market the ignition device for stoves. There is no reason why the defendant would have intentionally failed to market the device if the defendant's officers believed the effort would have been profitable. The effort was abandoned because of the corporate officers' and employees' firm conviction that the device was not ready to market and could never be prepared for successful marketing. There is no allegation or evidence that Vernitron's officers or directors were conspiring to drive down the stock's price by "sandbagging" the piezoelectric division. It would have been contrary to the officers' own best interests to abandon a potentially successful project. Vernitron's officers were simply unable to overcome the obstacles to getting the ignition device ready for production or marketing for use in gas stoves. The lack of AGA approval, the red-tagging by local gas companies and the difficulties Vernitron encountered when trying to develop a "universal kit" proved to be too much for Vernitron's management and convinced them to focus their efforts elsewhere. Plaintiffs have produced no evidence of any bad faith, fraud, gross overreaching or abuse of discretion. Therefore, under Massachusetts and Delaware law the plaintiffs have no cause of action against the defendant for breach of fiduciary duty or corporate mismanagement. Accordingly, the defendant's motion for summary judgment on Count V is allowed.

Summarizing, defendant's motion for summary judgment is allowed with respect to Counts II, III and V, as to which the court orders dismissal; and denied with respect to Counts I and IV.